**Eugene B. KANIA**

v.

**The UNITED STATES**

No. 6–80C.

United States Court of Claims.

May 20, 1981.

Joseph J. Marcheso, New York City, atty. of record, for plaintiff.

Frank M. Rapoport, Washington, D.C., with whom was Acting Asst. Atty. Gen. Thomas S. Martin, Washington, D.C., for defendant.

Before NICHOLS, KUNZIG and SMITH, Judges.

ON PLAINTIFF'S MOTION FOR SUM-MARY JUDGMENT AND DEFEND-ANT'S CROSS–MOTION FOR SUM-MARY JUDGMENT

NICHOLS, Judge.

This case comes before the court on cross-motions for summary judgment filed by plaintiff and defendant. There is no issue of relevant fact. The claim is for expenses incurred in preparing the defense of a party indicted for a crime, under peculiar circumstances, but never tried. Plaintiff seeks recovery in the amount of $42,000 plus interest and costs.

I

Plaintiff, Eugene Kania, is a former officer of the Railway Express Agency, Inc. (REA). He served as vice president of finance from approximately December 1970 to December 1974. REA was for many years engaged in commerce as a common carrier and conducted a ground and air express service within the United States. On or about February 18, 1975, REA filed a petition in the United States District Court for the Southern District of New York, pursuant to Chapter XI of the Bankruptcy Act. On or about November 6, 1975, REA was adjudicated a bankrupt and a trustee in bankruptcy was appointed.

In or about 1974 the Interstate Commerce Commission (ICC) began an investigation into the affairs of REA. The investigation was subsequently referred to the United States Attorney for the Southern District of New York who then assumed control of the investigation in collaboration with the ICC. The investigation dealt with complex and myriad activities of REA spanning a period in excess of 12 years and encompassed, with other things, allegations of political and financial corruption.

In July 1974 an investigator of the ICC sought out the plaintiff and asked his assistance in unraveling the affairs of REA. Plaintiff was assured by the investigator that he was not a target of the investiga-

tion. Plaintiff cooperated with the investigator, was interviewed without an attorney, and was thereafter subpoenaed to appear before a grand jury empaneled in the Southern District of New York.

On or about October 25, 1977, an Assistant United States Attorney (AUSA) for the Southern District of New York, Dominic Amorosa, spoke with plaintiff and told him his assistance was valuable to the government's investigation, the government was desirous of his continued assistance, and, under no circumstances was he a target of the investigation. On the same day, pursuant to subpoena, plaintiff testified before the grand jury concerning various matters at REA.

In January 1978 AUSA Amorosa solicited plaintiff's further cooperation. Plaintiff was then represented by counsel. Prior to divulging any information, plaintiff and AUSA Amorosa entered into an agreement with regard to plaintiff's appearance before the grand jury. It concerned the question of whether plaintiff would or would not be prosecuted. That agreement was never reduced to writing.

A dispute later arose over the terms of the agreement. It was plaintiff's understanding that if he cooperated with the government by testifying truthfully before the grand jury he would not be prosecuted for any of his actions which occurred while he was employed at REA. Plaintiff described the agreement as affording him transactional immunity.

It was the government's position that plaintiff's obligation encompassed not only the giving of truthful testimony before the grand jury, but also a duty to answer fully all government inquiries outside the courtroom and to reveal all of his and others' wrongful conduct at REA. The government denied that plaintiff had been given full transactional immunity. Instead, the government explained that plaintiff had been afforded only informal, conditional immunity.

Plaintiff was brought before the grand jury in March 1978 to testify about the bribery schemes. On November 2, 1978, Amorosa notified Mr. Kania that he was a target of a grand jury investigation. After Mr. Kania declined to appear voluntarily and denied all wrongdoing, the matter was brought before the grand jury which indicted him on March 8, 1979.

Shortly thereafter, Mr. Kania through his present counsel, filed a motion to dismiss the indictment averring that the government had violated its agreement not to prosecute him if he testified truthfully before the grand jury. The government opposed this motion and a hearing was held. Judge Morris E. Lasker, of the United States District Court for the Southern District of New York, granted the motion to dismiss the indictment on May 2, 1979. In so ruling, Judge Lasker held that the agreement was that Mr. Kania would not be prosecuted if he testified truthfully to whatever he was asked to testify, and that there was no evidence that Mr. Kania violated that agreement. There was no appeal of that decision.

II

Plaintiff says that his agreement with the government was a contract. The terms of that contract were that the United States Attorney's office would not prosecute plaintiff in connection with any of his actions at REA in return for his good faith testimony before the grand jury. According to plaintiff, the contract terms were memorialized by AUSA Amorosa at the commencement of plaintiff's grand jury appearance on March 8, 1978. At that time and after plaintiff had been duly sworn in, he was asked by Mr. Amorosa, "Mr. Kania, have you been told by a representative of the government that you will not be prosecuted in connection with this matter in return for your good-faith testimony?" Plaintiff then replied, "Yes, I have."

Continuing along this line of argument, plaintiff says that by testifying before the grand jury he performed his obligations under the contract. The government was benefitted by plaintiff's performance, yet breached the contract when AUSA Amoro-

sa asked the grand jury for the Southern District of New York to return an indictment against the plaintiff. According to plaintiff, this breach damaged him because he was forced to proceed with time consuming and expensive pretrial discovery and trial preparation without ascertaining the scope of his immunity, because of the provisions of the Speedy Trial Act, 18 U.S.C. § 3161 which require trial to commence within 60 days of the date of arraignment. Although he moved expeditiously to dismiss the indictment, there was no assurance that the motion would be granted. Therefore, plaintiff claims that he was damaged in that he incurred various costs and expenses including but not limited to legal fees incurred in defending against the indictment.

The government counters by asserting that plaintiff's claim is based in tort, not contract, and is a claim for malicious prosecution. Or in the alternative it is a claim for attorney's fees incurred by plaintiff while defending a criminal prosecution. Either way, plaintiff would not be entitled to recovery if defendant is correct.

### III

■ We cannot agree with plaintiff's argument that Judge Lasker found that there was a contract between plaintiff and the United States and that therefore the doctrine of collateral estoppel precludes relitigation of that question. Judge Lasker did find that there was an agreement between plaintiff and defendant. His exact language was—

> In January of 1978, the Government indicated to Mr. Kania that they wanted further testimony from him. * * * [A]nd an oral agreement was entered into between the Government and the defendant with regard to his appearance before the grand jury and the question of whether he would or would not be prosecuted.

Throughout his opinion Judge Lasker referred to the arrangement as an agreement, not a contract. But, of course the fact that the catch-word, or exact legal terminology of "contract" was or was not used is not dispositive. Our decision here does not turn on whether Judge Lasker or either of the parties might have earlier described the arrangement as a "contract."

Indeed, both parties have changed their respective positions on the question of whether or not their arrangement was or was not a contract. The government in its affidavit sworn to on April 20, 1979, by AUSA Amorosa states, "[h]e [Kania] and the Government simply entered into a contract which barred his prosecution for all offenses he committed while at REA in return for * * *." And Judge Lasker found, "[i]t is the Government's position that it had a contract with Mr. Kania to cooperate in good faith." The government's current position is that there was no contract and that plaintiff invokes contract theory to mask what is in reality a claim alleging tortious injury and violations of constitutional due process.

And plaintiff's earlier position was also quite different from his present position. In response to the government's prior contract argument, plaintiff asserted, "[i]n paragraphs 8 and 9 of his affidavit, Mr. Amorosa attempts to reduce the issue now before the Court to a matter of contract law. * * * The issue before this Court [U.S. District Court SDNY] is not one which can be decided on the basis of a simplistic consideration of contract law. Rather the issue is one of fairness which rises to constitutional dimensions." Now both parties chastise one another for their prior statements and positions, and subsequent turnabouts.

### IV

■ The reason that plaintiff's contract argument must fail here is because this court has no jurisdiction to award damages for his claim against the government. Section 1491 of Title 28 of the United States Code (Tucker Act) grants the court jurisdiction to redress claims against the U.S. Government "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or un-

**268**

liquidated damages in cases not sounding in tort." Plaintiff cites to no applicable section of the Constitution or to any statute or regulation entitling him to recover damages against the government in this court under the facts stated. Therefore his claim must fail. *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002 (1967); *Austin v. United States*, 206 Ct.Cl. 719, *cert. denied*, 423 U.S. 911, 96 S.Ct. 215, 46 L.Ed.2d 140 (1975); *Doe v. United States*, 650 F.2d 287 Ct.Cl. No. 457–78 (order entered May 16, 1980); and *Festa v. United States*, 650 F.2d 290 Ct.Cl. No. 438–79C (order entered October 17, 1980). (In both the *Doe* and *Festa* cases cited above plaintiffs sought damages for breach of contract under the Witness Protection Program of the Department of Justice under the Organized Crime Control Act of 1970, Pub.L. No. 91–452, title V, §§ 501, 504, 84 Stat. 933 (1970).)

■ The contract liability which is enforceable under the Tucker Act consent to suit does not extend to every agreement, understanding, or compact which can semantically be stated in terms of offer and acceptance or meeting of minds. The Congress undoubtedly had in mind as the principal class of contract case in which it consented to be sued, the instances where the sovereign steps off the throne and engages in purchase, and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves. If the government insists on making itself the sole judge of law and fact in all disputes between its contractors and itself, the prices and terms it pays or receives will compare unfavorably with those that obtain in purely private transaction.

■ Thus it has long been held that the rights of civilian and military public employees against the government do not turn on contract doctrines but are matters of legal status even where compacts are made. *Shaw v. United States*, 640 F.2d 1254 at 1260 (1981). Thus the consent to suit for back pay by employees when given, is not given by the consent in the Tucker Act to suits on contracts. A contract between government and one of its employees is possible, but it must be specifically spelled out as a contract. *United States v. Hopkins*, 427 U.S. 123, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976). The contract must be made by a person having authority, *Walton v. United States*, 213 Ct.Cl. 755 (1977). Similarly, the government can be liable in Tucker Act suits brought to enforce grant contracts for disaster relief, but only to the extent it has expressly indicated its intent to be obligated to pay money. *State of Texas v. United States*, 210 Ct.Cl. 522, 529, 537 F.2d 466, 469–70 (1976). The claimant for money damages for breach of an express or implied in fact contract must show that the officer who supposedly made the contract had authority to obligate appropriated funds. *Grismac Corp. v. United States*, 214 Ct.Cl. 39, 556 F.2d 494 (1977). By the same line of reasoning, we would deem it possible to make a binding contract subject to Tucker Act jurisdiction, creating a liability for breach of a plea bargaining agreement or one to grant immunity for giving testimony, or to protect a witness. But, in such case, the court would look for specific authority in the AUSA to make an agreement obligating the United States to pay money, and spelling out how in such a case the liability of the United States is to be determined. This is the rationale of our recent witness protection cases, and is the means by which we must determine our jurisdiction of the instant claim. Yet there was no attempt to show the AUSA had such authority.

The need for specificity is the greater because the role of the judiciary in the high function of enforcing and policing the criminal law is assigned to the courts of general jurisdiction and not to this court. It would be reasonable to expect that the court which is to police and, in appropriate cases enforce, agreements for plea bargains, or witness protection, or for immunity, will be the courts in which are or will be pending the criminal prosecutions to which the agreements relate. If this means that money damages for breach are nowhere availa-

ble, this is the case in any claim area where the Congress has not seen fit to grant its consent to be sued. It is particularly unreasonable to suppose that Congress in enacting the Tucker Act intended for this court to intervene in the delicate and sensitive business of conducting criminal trials. *Cf. United States v. Jones,* 131 U.S. 1, 9 S.Ct. 669, 33 L.Ed. 90 (1889). If, in a case like Mr. Kania's, a future district judge knew his findings on the motion to dismiss would by collateral estoppel create a liability for money damages in this court and out of his control, this might influence his willingness to grant the relief Judge Lasker granted, to the future disadvantage of such as the plaintiff. *Cf. Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

█ The sovereign's consent to be sued cannot be implied but must be unequivocally expressed. *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The Court did not say this in the context of a claim founded on an alleged contract, but there can be no doubt it there stated the rule of construction which must animate our decisions that deal with sovereign immunity and the consent to suit in every Tucker Act category.

For the above explained reason, it does not matter whether Judge Lasker used the term "contract" or "agreement." Even though the arrangement between plaintiff and defendant was sufficient to warrant dismissing the indictment before the district court, it is not sufficient to give this court jurisdiction or power to award money damages pursuant to that arrangement. Our very specific jurisdictional standards have not been met. The doctrine of collateral estoppel is not applicable.

## V

█ And finally, we address defendant's argument that plaintiff is not entitled to relief because, absent specific legislation to the contrary, the costs of litigation, including attorney's fees, are not recoverable in federal litigation. Defendant is correct. It is well settled that in the absence of specific statutory authority, expenses incurred in litigation, whether legal, accounting, secretarial, or other, are not awardable as such. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 265–68, 95 S.Ct. 1612, 1626, 44 L.Ed.2d 141 (1975); *Kurz & Root Co. v. United States,* Ct.Cl. 652 F.2d 69 (1981); *Aparacor, Inc. v. United States,* 215 Ct.Cl. 596, 571 F.2d 552 (1978); *J. E. Robertson Co. v. United States,* 194 Ct.Cl. 289, 437 F.2d 1360 (1971); *Dittmore-Freimuth Corp. v. United States,* 182 Ct.Cl. 507, 390 F.2d 664 (1968); and *Dale Construction Co. v. United States,* 161 Ct.Cl. 825, 831 (1963).

Plaintiff Kania asserts that he is not seeking the costs of litigation or attorney's fees, as such, rather he seeks damages arising from the government's breach of contract. Since the attorney's fees and expenses that he was forced to pay were a result of the indictment returned against him in "breach of contract," plaintiff argues that they are properly compensable as contract damages. We have already determined that if there was a compact or agreement between plaintiff and defendant, there was no contract sufficient to satisfy this court's jurisdictional requirements. Should this be in error, we must now add that jurisdiction to award counsel fees and other litigation expenses as an element of breach damages would be extremely dubious. It is the kind of consequential damages not normally awarded in contract breach cases. *William Green Construction Co. v. United States,* 201 Ct.Cl. 616, 477 F.2d 930 (1973), *cert. denied,* 417 U.S. 909, 94 S.Ct. 2606, 41 L.Ed.2d 213 (1974). Courts do not, in awarding breach damages, follow through the remote indirect consequences of the breach as distinguished from those directly in contemplation when the contract was made. *Northern Helex Co. v. United States,* 207 Ct.Cl. 862, 524 F.2d 707 (1975), *cert. denied,* 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976). No matter whether characterized as litigation costs or contract damages, plaintiff's counsel fees are not recoverable in this court.

For these reasons, plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted. The petition is dismissed.