**Robert G. PHELPS**

v.

**UNITED STATES.**

No. 63–81C.

United States Claims Court.

July 31, 1984.

John Astuno, Jr., Denver, Colo., for plaintiff.

Michael T. Paul, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### OPINION

SETO, Judge:

This implied-in-fact contract case is before the court on defendant's motion for summary judgment. Plaintiff herein asserts that, in return for his help with a Federal Bureau of Investigation operation, the Bureau promised to indemnify him for any losses he would incur in rendering such aid. Defendant contends, alternatively, that the terms of an express contract between plaintiff and the FBI have been fulfilled and that no implied-in-fact contract existed.

Defendant's brief in support of its motion includes several affidavits by agents of the Federal Bureau of Investigation (the "FBI" or the "Bureau"), including those of the FBI's contracting officer and the Special Agent in Charge of the undercover operation in question. Plaintiff's opposing brief, including plaintiff's affidavit, sets forth the argument that summary judgment is inappropriate as there exist disputed issues of material fact. Oral arguments were heard on the motion.

It is concluded that there is no genuine dispute concerning the facts necessary to render summary judgment, and that, even when viewed in the light most favorable to plaintiff, the facts show that defendant is entitled to judgment as a matter of law. Therefore, defendant's motion will be granted and plaintiff's complaint is to be dismissed.

### FACTS[1]

In early 1978, the Denver, Colorado, office of the FBI planned, with the approval of FBI Headquarters ("FBIHQ") in Wash-

---

1. The statement of facts is drawn from plaintiff's complaint and brief in opposition to defendant's motion and from the sworn affidavits appended to the briefs.

ington, D.C., an undercover criminal investigation which involved the use of a bar or lounge in the Denver area. Theodore P. Rosack, the Special Agent in Charge of the Denver office, was authorized to expend up to $108,400 on the investigation. Agent Rosack delegated to Special Agent John L. Horn the authority to make reimbursement for actual expenses incurred in carrying out the investigation. Agent Horn's authority to disburse available money was limited to such reimbursement.[2]

Plaintiff is a real estate broker in the Denver area, who "was well known to personnel of the Denver office [of the FBI] and considered a friend of the Bureau...."[3] Plaintiff was asked by Agent Horn to assist the FBI in the investigation by buying a lounge the Bureau had found and allowing the Bureau to use the lounge in the course of the proposed investigation. Plaintiff states that he was reluctant to buy the lounge in question because he felt that the selling price of the lounge was too high; that he did not have a good opinion of the seller; and that he had no desire to own or operate a lounge.[4] Plaintiff avers that Agent Horn assured him that the Bureau would reimburse him for any losses he might incur, and that, after the operation was completed, retired FBI agents would be found to operate the lounge. Plaintiff never spoke with Agent Rosack or with Agent William E. Baugh (the authorized contracting officer for the operation), but, on the strength of Agent Horn's assurances, agreed to help the Bureau.

Plaintiff established a corporation to own and operate the bar, and arranged to have the corporation purchase the lounge. As evidenced by a telegram sent by the Denver office to FBIHQ, a $5,000 security deposit was required prior to purchase. The telegram, sent on May 23, 1978, acknowledges that plaintiff was buying the lounge

"on behalf of the Bureau" and had no desire to own a lounge. The telegram requested FBIHQ to immediately forward the required $5,000, and noted that the money would "be refunded to [the] Denver Division at such time that [the] deal is closed and [the] tavern finally purchased." The sum was evidently sent (although neither party discloses whether or not it was repaid), and plaintiff proceeded to close the sale. At the closing of the sale to the corporation, a down payment of $40,000 was made, of which plaintiff asserts the Bureau paid over $26,000.

On May 25, 1978, plaintiff and the FBI executed an agreement concerning the FBI's use of the lounge. The terms of the agreement were that the Bureau would operate the lounge, in return for which it would pay plaintiff $3,500 per month, but in no event less than a total aggregate amount of $25,000. The contract further provided that the Bureau could terminate the contract at will, and that, should the total of the monthly payments at the time of termination aggregate less than $25,000, the difference between the sum of the monthly payments and the minimum amount of $25,000 would be offset by the profit, if any, received by plaintiff upon the subsequent sale of the lounge. The agreement was signed by plaintiff and Agent Baugh.

The Bureau began operating the lounge in July 1978. In March 1979, plaintiff was informed that the investigation would be terminated in May of that year. The operation was ended on May 31, by which time the FBI had paid plaintiff $34,000 pursuant to the agreement, plus an additional $9,378.80 to reimburse plaintiff for expenses such as taxes, licenses, and attorney fees.[5]

By the end of May 1979, an employee of plaintiff's corporation had assumed the

---

**2.** Affidavit of Theodore P. Rosack.

**3.** Affidavit of David R. Barham, ¶ 5(b).

**4.** Plaintiff's Affidavit.

**5.** No accounting is made by either party of the money assertedly paid over by the FBI as part

of the down payment for the purchase of the lounge, nor is it claimed by either party as a set-off, counterclaim, or claim. The court therefore assumes that this amount is not material to the issues raised by defendant's motion.

management of the lounge, and by the end of June 1979, all FBI personnel had been phased out of the lounge. According to plaintiff, the lounge's financial records, provided by the FBI and checked by plaintiff's accountant, showed that the lounge had lost approximately $6,000 per month while the FBI operated the lounge. Plaintiff sold the lounge in October 1979 for $78,000. He alleges: (1) a cash loss of over $21,000 on the re-sale of the lounge; (2) a loss of income for his services of $24,000; (3) a consequential loss of $62,000 comprised of a $50,000 loss from the forced sale of an aircraft because of the above losses and a $12,000 loss of investment tax credits for the aircraft; (4) remaining corporate debts of $8,500; and (5) damage to plaintiff's credit reputation in the amount of $50,000. Pursuant to the Contract Disputes Act (41 U.S.C. §§ 601 *et seq.*), plaintiff filed a claim with the FBI. The FBI denied plaintiff's claim in December 1980, and plaintiff filed his claim in this court for $166,158.34 on February 9, 1981.

## DISCUSSION

Defendant contends it is entitled to judgment in its favor because: (1) plaintiff has no claim based on the express contract, inasmuch as the Bureau fully performed according to the terms of the express agreement; and (2) plaintiff has no claim based on an implied contract since no one in the FBI who had the authority to bind the Government ever made any indemnification promises to plaintiff. Plaintiff does not contend that any payment is due him under the terms of the express contract, but does aver that that contract does not contain the *entire* agreement between the parties. Plaintiff argues that, because the extent of the contract between the parties remains in issue, summary judgment is not appropriate.

Defendant has submitted, among others, the affidavits of William E. Baugh and Theodore P. Rosack. Agent Baugh was the FBI's designated contracting officer during the period in which the instant facts arose. In his affidavit, at paragraph 9, he states:

Since executing the May 25, 1978 agreement, I have received no request to alter or expand the terms of this contract. Furthermore, I have not agreed to pay [plaintiff] any more money than is called for by the May 25, 1978 contract or than was provided to him as reimbursement for actual expenses incurred in connection with the operation of the bar/lounge by the FBI. I have also not otherwise committed the United States to pay [plaintiff] any more money than has already been paid to him in connection with the FBI's operation of the bar business described in the May 25, 1978 agreement.

Agent Rosack, in his affidavit, asserts that, as Special Agent in Charge of the Denver FBI office during the operation in question, he had authority to disburse the money allocated to the investigation, but that "[he] did not have the authority to promise to indemnify [plaintiff] for any losses he [plaintiff] might suffer in the [lounge] business and, accordingly, could not and did not authorize indemnification to [plaintiff]." Agent Rosack further states that although he did delegate to Agent Horn the authority to disburse money in connection with the investigation, that authority was limited to disbursement for actual expenses only.

Based on the assertions contained in these affidavits, defendant contends that, even if agents of the FBI did promise to indemnify plaintiff, none of those so promising had the authority to bind the Government. Such authority is a strict prerequisite of an implied-in-fact contract with the United States:

The claimant for money damages for breach of an express or implied in fact [sic] contract must show that the officer who supposedly made the contract had authority to obligate appropriated funds. *Grismac Corp. v. United States,* 214 Ct.Cl. 39, 556 F.2d 494 (1977). [*Kania v. United States,* 227 Ct.Cl. 458, 465 [650

F.2d 264], *cert. denied*, 454 U.S. 895 [102 S.Ct. 393, 70 L.Ed.2d 210] (1981).]

In this regard, *see also Radioptrics, Inc. v. United States*, 223 Ct.Cl. 594, 612, 621 F.2d 113 (1980); *Operational Manuals, Inc. v. United States*, 205 Ct.Cl. 854, 856, 506 F.2d 1406 (1974). If no showing is made that the officer had the requisite authority to bind the Government, the Government is not estopped to deny the unauthorized acts or promises of that officer. *See, e.g., Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 *reh'g denied*, 451 U.S. 1032, 101 S.Ct. 3023, 69 L.Ed.2d 401 (1981). It is the claimant's responsibility to ensure that the agent with whom he deals has the authority to bind the United States to the promises the agent makes. *Thanet Corp. v. United States*, 219 Ct.Cl. 75, 85, 591 F.2d 629 (1979). Thus, before plaintiff can put into issue the question of what the contract concerned or the extent of the contract's parameters, plaintiff must satisfy the first requirement of showing that the agent purporting to make promises could validly make any enforceable promises.

In opposition to defendant's motion, plaintiff attempts to establish by inference that the implied-in-fact contract was ratified by those with authority to do so. First, he argues that Agent Baugh, the contracting officer, knew that plaintiff was purchasing the lounge on behalf of the Bureau because Agent Baugh's name and initials appear on the May 23, 1978, telegram requesting permission to advance $5,000 to plaintiff. Plaintiff's inferential step from acknowledging the telegram to ratifying an indemnification agreement is a feeble attenuation at best. The telegram makes no mention of any type of indemnification agreement; it does, however, refer to a "tentative agreement [which] has been drawn up the terms of which have been previously discussed with William Baugh, contracts and leases, FBIHQ." In the absence of any indication to the contrary, it is assumed that this "tentative agreement" is the one eventually executed on May 25,

1978. The telegram makes no mention of any change in the terms of that agreement, nor can a proposed change be inferred. It is stated that the $5,000 requested would be returned to the Denver office after the lounge had been bought, and the only inference to be drawn is that Agent Baugh, in his role as contracting officer, approved the *temporary* expenditure of the $5,000.

Plaintiff also makes much of the fact that the FBI reimbursed him for more than $9,000 in actual expenses incurred in buying the lounge. Plaintiff argues that "[i]t is inconceivable that the FBI, specifically the special agent in charge of the Denver officer, Mr. Razack [sic; Rosack], would have paid any of these expenses if [plaintiff] had been purchasing the bar for himself."[6] On the contrary, this court finds it quite conceivable that the Denver office would pay these expenses for a variety of reasons whether plaintiff were buying the lounge for himself or not. It may have been that the office wished to expedite the purchase of the lounge so as to avoid delaying the start of the investigation; or that the Bureau, in recognition of plaintiff's aid, wished to help defray the expense to plaintiff; or that the $9,000 itself was an unauthorized expenditure which the FBI has chosen not to recover.

Whatever the explanation, the inference that this expenditure evidences an implied-in-fact contract for indemnification is rebutted by: (1) the uncontradicted affidavits of agents Baugh and Rosack; (2) the fact that the sum of $5,000 discussed above was not allocated outright to the purchase of the lounge, but was to be repaid to the Denver office; and (3) the very language of the express contract. The express contract clearly indicates that the lounge in question was to belong to plaintiff. Paragraph (1) of that contract states: "[Plaintiff will allow the [FBI] to operate ... the Bar/Lounge...." and paragraph (4) contains the phrase: "Any profit the first party might make from a sale of the premises ... will lessen the amount the [FBI] might have to pay under [this paragraph]."

---

6. Affidavit of plaintiff.

These phrases make it clear that ownership of the lounge was to rest with plaintiff.

Plaintiff has not established a single fact from which the court can infer that the agents with whom plaintiff dealt had the authority to enter into enforceable agreements. His affidavit, for the most part, merely reiterates the pleadings in his complaint. He speaks of Agent Horn's "assurances" that Agent Rosack was aware of the promises allegedly made, and states that he was told that "a more detailed written agreement [could not be made] because the operation was confidential." [7] These factors do not make or strengthen a showing or an inference that the agents making these representations had the requisite authority. Plaintiff "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." RUSCC 56(e). Plaintiff, however unfortunately he may have been mislead, has not established the "specific facts" needed to defeat defendant's motion.[8]

### CONCLUSION

 Plaintiff has failed to show that any valid, enforceable contract for indemnification existed between him and the United States. Such an agreement can only be binding on the Government when made by one with authority to bind the Government. Where such authority is lacking, reliance is neither reasonable nor justified. If an agreement was made with plaintiff, it was not one enforceable by this court. The Court of Claims has said:

> The contract liability which is enforceable under the Tucker Act consent to suit does not extend to every agreement,

understanding, or compact which can semantically be stated in terms of offer and acceptance or meeting of minds. [*Kania v. United States*, 227 Ct.Cl. 458, 464 [650 F.2d 264], *cert. denied*, 454 U.S. 895 [102 S.Ct. 393, 70 L.Ed.2d 210] (1981).]

Assuming that promises were made to plaintiff regarding indemnification, it has not been shown that those making the promises had the authority to do so, and the uncontradicted affidavits submitted by defendant show that those with the necessary authority made no such promises. In these circumstances, any agreement plaintiff had was one to which "[t]he contract liability ... enforceable under the Tucker Act consent to suit does not extend...." *Id.*

For the reasons stated above, defendant's motion for summary judgment is GRANTED, and plaintiff's complaint is to be DISMISSED.

IT IS SO ORDERED.

---

**7.** It is difficult to understand how plaintiff could believe that an indemnification agreement would be any more revealing of the undercover investigation than the operating agreement, or why a clause which might have obligated the FBI to pay $140,000 was a "detail" to a contract guaranteeing only $25,000.

**8.** The court notes that: (1) at least one of plaintiff's claims, that of $50,000 in compensation for damage to plaintiff's credit reputation, appears

to sound in tort and is therefore one of which this court has no jurisdiction, 28 U.S.C. § 1491(a)(1); and (2) although plaintiff states that he is proceeding according to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601 *et seq.*, he has not shown that his claim for over $166,000 has been certified as required by 41 U.S.C. § 605(c)(1). Because of the court's disposition of this matter and because the parties did not brief these issues, they are not discussed.