**Tony SILVA, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 01–237 C.

United States Court of Federal Claims.

Jan. 11, 2002.

---

4. Defendant alleged this in its November 13 cure notice. Plaintiff did not dispute this in its No-vember 18 or 25 letters.

Tony Silva, Miami, FL, pro se plaintiff.

Matthew P. Reed, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant, with whom were Kathryn A. Bleecker, Assistant Director; David M. Cohen, Director; and Stuart E. Schiffer, Acting Assistant Attorney General. Jean Sutton, United States Department of the Interior, of counsel.

## OPINION

DAMICH, Judge.

Presently before the Court is the Defendant's motion to dismiss for lack of subject-matter jurisdiction, pursuant to Rule of the Court of Federal Claims ("RCFC") 12(b)(1), or, in the alternative, for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(4). The Plaintiff seeks the value of 103 parrots (as well as the value of their potential progeny) that were seized by the Government in a sting operation. Because, in this instance, this Court does not possess jurisdiction to hear claims for money damages associated with the seizure of property pursuant to a criminal investigation, the Defendant's motion to dismiss for lack of subject-matter jurisdiction is GRANTED.

### I. Background

Plaintiff Tony Silva is an expert and dealer in exotic birds. On August 22, 1989, the Plaintiff entered into a breeding loan contract with James Mackman in which Mr. Mackman would care for and feed certain birds belonging to the Plaintiff in return for 50 percent of the progeny produced from the birds. Pl.'s Compl. Ex. A at 1. However, at some point in time disputed by the parties, Mr. Mackman agreed to become a "cooperating private individual" ("CPI") with the Fish and Wildlife Service ("FWS"). In an agreement between Mackman and the FWS signed on May 18, 1990, Mackman agreed "to provide intelligence information" to the FWS and "document violations of state and federal wildlife laws if any" with respect to "subjects of major importance in the exotic bird trade." Pl.'s Compl. Ex. I at 1 (capitalizations modi-

fied). In furtherance of these objectives, Mr. Mackman was directed to establish a breeding operation for exotic birds secretly under the direction of the FWS. *Id.* In return, the FWS agreed to pay Mackman $1,750 per month and also to pay all expenses related to the breeding loan operation. Pl.'s Compl. Ex. I at 2.

Pursuant to an undercover investigation of the Plaintiff, Mackman held at his aviary, under the guise of the breeding loan agreement, 110 psittacine birds, i.e., parrots, belonging to the Plaintiff, some or all of which were protected birds illegally imported into the United States. One hundred and three of the parrots were collected by the Government on January 16, 1992, in conjunction with the execution of a search warrant. Pl.'s Compl. Ex. D at 1. On April 24, 1992, an Assistant U.S. Attorney ("AUSA") for the Northern District of Illinois informed the Plaintiff's then-counsel, Mr. David Schippers, that some of these parrots had tested positive for a variety of diseases or had been exposed to diseased birds and the Government had concerns that, if the Plaintiff's birds were to be dispersed to the general bird population, further spread of the disease would occur. *Id.* The AUSA requested that the Plaintiff abandon the parrots to the Government so they could be "donated to one or more scientific research projects." Pl.'s Compl. at Ex. D at 4. According to the Government, the Plaintiff's mother, Gila Daoud, signed an abandonment form on behalf of the Plaintiff, thereby releasing the birds to the Government. Def.'s Mot. at App. 94.[1] These parrots were subsequently distributed to various persons and institutions.

On January 30, 1996, pursuant to a plea agreement, the Plaintiff pled guilty to illegal importation of protected wildlife, conspiracy to illegally import protected wildlife, and tax evasion. Def.'s Mot. at App. 54.

On October 14, 1997, Mr. Schippers wrote a letter to the AUSA claiming that, while the Plaintiff abandoned the birds because the Government represented that the parrots were sickly or had been exposed to diseases and that they needed to be euthanized, he had learned through a FOIA request by a third party that the birds were healthy and that they were not destroyed. Pl.'s Compl. Ex. C at 1–2. The Plaintiff claims that he learned of the true situation in late 1998.

On April 20, 2001, the Plaintiff filed a complaint in this Court and also subsequently filed amendments on May 8, 2001, and May 21, 2001. The Plaintiff claims that the collection and disposition of the birds at issue by the Government breached the loan agreement entered into by Mr. Mackman on behalf of the Government and also resulted in a taking under the 5th Amendment.

## II. Standard of Review

"[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); accord *Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989). In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by a plaintiff are true. *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988).

## III. Discussion

■ Assuming, but not deciding, that the Plaintiff is in privity of contract with the United States by means of the breeding loan agreement between the Plaintiff and Mr. Mackman,[2] this Court does not have jurisdic-

---

1. The Plaintiff maintains that he never authorized his mother to abandon the birds to the Government and that Mr. Schippers never informed him of the Government's request to abandon the birds. (Pl.'s Opp'n at 4–5.) Assuming, without deciding, that the Plaintiff is correct, there is no effect upon the outcome of this decision.

2. Privity of contract is a pre-requisite for standing to sue in this Court. *National Leased Housing Assoc. v. U.S.,* 105 F.3d 1423, 1435 (1997). However, because the Court dismisses the breach-of-contract claim for lack of subject-matter jurisdiction on other grounds, the Court need not address this issue.

tion over either the breach-of-contract claim or the takings claim. The Tucker Act vests the Court of Federal Claims with "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). This statute serves as a waiver of sovereign immunity as to those claims. *United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). However, the waiver of sovereign immunity must be expressed in unequivocal terms. *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (quoting *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)). Moreover, the jurisdiction in this Court to hear contract liability claims against the United States, as provided by the Tucker Act, does not extend to every situation where the government has entered into an agreement. *Sadeghi v. United States,* 46 Fed.Cl. 660, 662 (2000). As stated in *Kania v. United States,*

> The Congress undoubtedly had in mind as the principal class of contract case in which it consented to be sued, the instances where the sovereign steps off the throne and engages in the purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves.

*Kania v. United States,* 227 Ct.Cl. 458, 464, 650 F.2d 264 (1981). As a general rule, the Court's jurisdiction is limited to situations in which the Government acts in a non-sovereign capacity. *Doe v. United States,* 37 Fed. Cl. 74, 77 (1996). If the Government has entered into agreements in its capacity as sovereign, then this Court may still possess jurisdiction if a court can find "specific authority ... to make an agreement obligating the United States to pay money, and spelling out how in such a case the liability of the United States is to be determined." *Kania,* 227 Ct.Cl. at 465, 650 F.2d 264.

█ The need for specific authority to make an agreement obligating the United States to pay money is particularly strong when such agreements involve the operation of the criminal justice system. "The need for specificity is the greater because the role of the judiciary in the high function of enforcing and policing the criminal law is assigned to the courts of general jurisdiction and not to this court." *Id.* Without such specific authority, this Court has generally held that it does not possess subject matter jurisdiction over agreements made in the course of criminal proceedings, such as breach of plea agreements, immunity agreements, and witness protection agreements. *Sadeghi,* 46 Fed.Cl. at 662 (citing *Doe v. United States,* 37 Fed.Cl. 74 (1996) (no jurisdiction over breach of an agreement to seek reduction in sentences pursuant to Fed.R.Crim.P. 35(b)); *Drakes v. United States,* 28 Fed.Cl. 190 (1993) (no jurisdiction over breach of plea agreement); *Grundy v. United States,* 2 Cl. Ct. 596 (1983) (no jurisdiction over witness protection agreements); *Kania,* 227 Ct.Cl. 458, 650 F.2d at 268, (no jurisdiction over immunity agreement)).

In the present case, the agreement at issue between Mackman and the Plaintiff consists of a breeding loan agreement which is on its face a commercial agreement between two private parties. However, assuming that privity contract exists between the Plaintiff and the Government with respect to this contract, the purpose for which the Government would have entered into this agreement would not be for purchasing exotic birds for the public benefit—an agreement that the Smithsonian Institution might conceivably make for the National Zoo. This contract would have been entered into by the FWS for the purpose of furthering undercover law enforcement operations for illegal importation of wildlife. Although these agreements were made prior to the filing of a criminal information or an impanelment of a grand jury, these law enforcement operations are activities of the criminal justice system, activities that, without question, lie "at the heart of sovereign action." *Sadeghi,* 46 Fed.Cl. at 662. Although the Plaintiff points to *Sommers Oil Company v. United States,* 241 F.3d 1375 (Fed.Cir.2001) for the proposition that this Court can hear agreements made by the Government in the course of a criminal investigation, this case is inapposite. *Som-*

*mers Oil* involved a claim for money damages pursuant to an agreement entered into by an informant with the Internal Revenue Service. This Court has long possessed jurisdiction over some informant contracts either under an implied contract theory or, in some circumstances, under the moiety statute, 19 U.S.C. § 1619. *See Doe v. United States,* 100 F.3d 1576 (Fed.Cir.1996). However, the Plaintiff was not an informer: he was a target of a criminal investigation who ultimately pled guilty to several charges resulting from the activities he engaged in pursuant to the breeding loan agreement. If, as the former Court of Claims has held, it is unreasonable to hold that, in enacting the Tucker Act, the Congress intended this Court to intervene in the conduct of criminal trials, *Kania,* 227 Ct.Cl. at 466, 650 F.2d 264 (citing *United States v. Jones,* 131 U.S. 1, 9 S.Ct. 669, 33 L.Ed. 90 (1889)), it is equally untenable to suppose that, barring some unusual circumstance, Congress intended this Court to possess jurisdiction over a claim for breach of an agreement entered into by the Government for the purpose of investigating and successfully prosecuting the criminal conduct of the claimant.

In addition, there is no specific language in the breeding loan agreement that purports to spell out how the liability of the United States, as such, is to be determined nor does the Plaintiff direct the Court's attention to anything that would vest in Mr. Mackman the specific authority to bind the United States in contract. Because the Plaintiff has failed to make this showing, this Court has no jurisdiction over any breach-of-contract claim with respect to the breeding loan agreement.

■ Furthermore, the rationale of *Kania* that this Court does not usually have jurisdiction under the Tucker Act for contract claims arising out of sovereign functions such as the criminal justice system, in part, "because the role the judiciary in the high function of enforcing and policing the criminal law is assigned to the courts of general jurisdiction and not to this court," *Kania,* 227 Ct.Cl. at 465, 650 F.2d 264, is equally applicable to a claim "founded ... under the Constitution," such as the takings claim in this specific case because a comparable remedy is potentially available in a criminal proceeding before the district court. In this case, the Plaintiff filed a habeas corpus petition requesting the return of the parrots. The district court denied such relief.

> In his reply brief, Mr. Silva alleges that the government improperly seized and did not return Mr. Silva's personal collection of birds. The correspondence between the government and Mr. Silva regarding those birds, however, makes clear that Mr. Silva "gave permission to have the birds destroyed and for that purpose, abandoned them to the government." (October 14, 1997 letter from David P. Schippers to Sergio Acosta). For these reasons Mr. Silva's claim is denied.

*Silva v. United States,* 75 F.Supp.2d 877, 885 (N.D.Ill.1999).

In particular, it should be noted that the habeas corpus motion was ruled upon after Silva allegedly learned that the parrots were not sick and were turned over to third parties.

The Defendant maintains that the Plaintiff was entitled to seek relief in the Northern District of Illinois under Fed.R.Crim.P. 41(e) for the return of the birds as provided below.

> Motion for Return of Property. A person aggrieved by an unlawful search and seizure or by the deprivation of property may move the district court for the district in which the property was seized for the return of the property on the ground that such person is entitled to lawful possession of the property. The court shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted, the property shall be returned to the movant, although reasonable conditions may be imposed to protect access and use of the property in subsequent proceedings. If a motion for return of property is made or comes on for hearing in the district of trial after an indictment or information is filed, it shall be treated also as a motion to suppress under Rule 12.

Fed.R.Crim.P. 41(e).

However, the Plaintiff does not seek in this Court the return of the parrots, but instead

seeks damages equal to the value of the parrots (and their progeny) that were taken by the Government. It is not clear whether, in the Seventh Circuit (which would have jurisdiction over any appeals in the Plaintiff's criminal case before the Northern District of Illinois), Rule 41(e) is construed to serve as a waiver of sovereign immunity entitling a criminal defendant to damages for the value of evidence seized. There is a circuit split on this issue. *Compare United States v. Bein,* 214 F.3d 408, 413–14 (3rd Cir.2000) *with U.S. v. Martinson,* 809 F.2d 1364, 1369 (9th Cir. 1987). Nevertheless, the Plaintiff had the opportunity to raise this argument or otherwise revise its petition for a writ of habeas corpus before the district court. Because the Plaintiff could have potentially sought the relief he seeks before this Court—the value of the 103 parrots at issue—in the district court and failed to pursue his claim, this Court does not have jurisdiction to intervene in the district court's enforcement of the criminal law under the guise of a takings claim. *See also Billy Norman Grimm v. United States,* 175 Ct.Cl. 883, 1966 WL 1534 (1966) (Court of Claims lacks jurisdiction to hear claim for value of automobile disposed of by the Government seized in connection with a criminal investigation). The inability of this Court to hear the takings claim is brought into sharper focus by the district court's prior ruling that the Plaintiff in fact voluntarily abandoned the parrots to the Government. Although the Plaintiff argues—contrary to what he argued before the district court—that the parrots were not formally "seized" by the FWS, this is not a question for this Court to decide but rather is yet another issue that the Plaintiff could have raised before the district court, but

chose not to. It is not this Court's normal function to police the enforcement of the criminal law.

It is important to note that this case does *not* clearly involve the scenario in which it is alleged that the Government, perhaps surreptitiously, disposed of evidence owned by a criminal defendant without his or her consent or knowledge, thereby depriving the district court of jurisdiction to order the Government to return the evidence or, in the alternative, to pay damages for the value of the evidence disposed of. If such a scenario were to arise, it would be necessary for this Court to make a more searching analysis as to whether, in such circumstances, the Tucker Act would vest this Court with the jurisdiction to adjudicate a takings claim against the Government for the value of the evidence disposed of. In this instance, however, the Plaintiff had the opportunity to file a motion before the district court for the value of the parrots after learning of the disposal, yet did not seek such relief.[3]

## IV. Conclusion

The Defendant's motion to dismiss for lack of subject-matter jurisdiction is GRANTED. The Clerk of the Court is directed to dismiss the complaint, with prejudice.

**IT IS SO ORDERED.**

---

3. It is also very likely that, if this Court did have jurisdiction over this case, the takings claim would be barred by collateral estoppel because the issue of whether the Plaintiff had voluntarily abandoned the birds was fully and fairly litigated.