**Howard V. GARY, et al., Plaintiffs,**

v.

**THE UNITED STATES, Defendant.**

**No. 03–1245C.**

United States Court of Federal Claims.

Aug. 10, 2005.

Daniel G. Grove, Lindsay Simmons, Jackson Kelly, Washington, D.C., April Min, Woodrow Turner, Jackson Kelly, Morgantown, W.Va., for plaintiff.

David B. Stinson, Attorney, Bryant G. Snee, Assistant Director, David M. Cohen,

Director, Commercial Litigation Branch, Civil Division, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant. Matthew Perry, Office of General Counsel, Federal Bureau of Investigation, Marlene Rodriguez, Office of the United States Attorney, Southern District of Florida, of counsel.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

This matter is before the Court on defendant's supplemental motion to dismiss plaintiffs' amended complaint or, in the alternative, for summary judgment. Plaintiffs Howard V. Gary and M Securities Investment, Inc., d/b/a Howard Gary & Company ("M Securities"), filed a complaint in this court on May 21, 2003, seeking $5 million in damages based upon the following counts: (I) an alleged oral contract between Mr. Gary and the United States, (II) an alleged implied-in-fact contract between Mr. Gary and the United States, and (III) an alleged uncompensated taking of M Securities, the entity through which Mr. Gary conducted his municipal bond underwriting business.[1] The Government moved to dismiss plaintiffs' complaint on statute of limitations grounds pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC") on August 20, 2003. Plaintiffs filed a response in opposition on September 22, 2003. On October 7, 2003, plaintiffs filed an amended complaint, which asserted the same three counts as the original complaint.

On October 20, 2003, the Government filed a "Reply to Plaintiffs' Response to Defendant's Motion to Dismiss and Defendant's Response to Plaintiffs' First Amended Complaint and Appendix." Plaintiffs subsequently moved to stay the proceedings to permit discovery on the issue of whether a contract existed between the parties, which was granted by order of Judge Firestone on December 16, 2003.[2] The case was transferred to the undersigned on January 20, 2004.

On September 22, 2004, plaintiffs filed a "Reply to Defendant's Response to the Plaintiffs' First Amended Complaint." On October 14, 2004, the Government filed a supplemental motion to dismiss, or, in the alternative, for summary judgment. Plaintiffs filed a response in opposition on December 23, 2004. The Government filed its reply on February 1, 2005. The Court heard oral argument on the motions on April 20, 2005.

For the reasons set forth below, defendant's motion to dismiss the contract claims set forth in Counts I and II for lack of subject matter jurisdiction is GRANTED. Defendant's motion to dismiss the Fifth Amendment taking claims set forth in Count III of the amended complaint for lack of subject matter jurisdiction is also GRANTED.

## BACKGROUND [3]

Mr. Gary is a resident of the state of Florida who assisted the Federal Bureau of

---

1. Although during oral argument plaintiffs' counsel asserted that the claims for breach of an oral or implied-in-fact contract belong to Mr. Gary personally while the taking claim belongs to M Securities, Transcript of Proceedings, *Gary, et al. v. United States*, No. 03–1245C (April 20, 2005) ("Tr.") at 74–76, the language of plaintiffs' prior pleadings and memoranda was not so precise, appearing instead to treat Mr. Gary and his company as each asserting taking claims. In accordance with the plain language of the amended complaint and with counsel's statement at oral argument, the Court construes the contract claims as belonging to Mr. Gary. Given the plain language of the amended complaint, *see, e.g.*, Am. Compl. ¶¶ 44–47, however, the Court has proceeded on the assumption that Mr. Gary and M Securities are each asserting taking claims based on the same set of facts.

2. Plaintiffs argued that defendant's motion to dismiss for failure to state a claim should have been treated as a motion for summary judgment because defendant relied on material outside the pleadings. Accordingly, plaintiffs sought a stay for the purpose of conducting discovery. Judge Firestone agreed, holding that the motion to dismiss had been converted to a motion for summary judgment and granted plaintiffs' motion to stay the proceedings to conduct discovery. On December 16, 2003, Judge Firestone entered an order granting plaintiffs' Rule 56(f) motion for a stay "to complete discovery concerning the existence, date and terms of any agreement between plaintiffs and the United States 'for reimbursement and compensation for [Mr. Gary's] cooperation in Operation Green Palm.' "

3. Unless otherwise indicated, the facts set forth in this section are either undisputed or alleged

Investigation ("FBI") in a public corruption investigation involving bond financing in Miami and Dade County, Florida, known as "Operation Green Palm." Def.'s Proposed Findings of Uncontroverted Fact ("Def.'s PFUF") ¶ 2. On July 3, 1996, Mr. Gary and his attorney, Peter Raben, signed a plea agreement with the United States. The agreement provided, in part:

> 1. The Defendant agrees to plead guilty to one count of Conspiracy to Commit Bribery in violation of Title 18, United States Code, Section 666(1)(a)(B), all in violation of Title 18 United States Code, Section 371, at a time to be set by the government.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> The Defendant agrees that he shall cooperate fully with the offices of the United States Attorney for the Southern District of Florida, the [FBI], and any other law enforcement agency designated by the above by:
>
> (a) providing complete and truthful information and testimony when called upon by the Office of the United States Attorney for the Southern District of Florida;
>
> (b) appearing at such grand jury proceedings, hearings, trials, and other judicial proceedings as may be required by the Office of the United States Attorney for the Southern District of Florida; and
>
> (c) working in a covert and proactive law enforcement capacity to contact, among others, various individuals known to the Defendant to have been involved in the prohibited conduct referenced above in paragraph 1, and other individuals involved in unrelated conduct then known to the defendant or government, all under the supervision of, and in compliance with, the FBI or any other designated law enforcement agency, as required by the Office of

the United States Attorney for the Southern District of Florida.

Def.'s App. at 9–11. The plea agreement also provided: "This is the entire agreement and understanding between the United States and the Defendant. There are no other agreements, promises, representations, or understandings." Pls.' App. at 93–94.

In a July 30, 1996 letter to FBI director Louis Freeh, William Keefer, the United States Attorney for the Southern District of Florida, stated that he supported and endorsed the FBI's proposed extension of Operation Green Palm. Pls.' App. at 95. The proposed extension, drafted by Supervisory Special Agent Michael Clemens, stated that Mr. Gary had provided information leading to the additional investigative opportunity. *Id.* at 97.

In the late summer of 1996, after Mr. Gary signed the plea agreement, Special Agents Hubert Alan Lane and Gary Favitta of the FBI instructed Mr. Gary to pursue bond pricing and closing of a transaction referred to as "the Montenay bond deal." *Id.* at 137. On October 9, 1996, Mr. Keefer, Assistant United States Attorney ("AUSA") Martin Goldberg, and AUSA Mary Butler filed an Information charging Miller Dawkins with conspiracy to commit theft and bribery, and this Information contained specific references identifying Mr. Gary as a cooperating witness working with the FBI. *Id.* at 117. It also described Mr. Gary's involvement in the conspiracy. *Id.* at 117–23. The FBI agents using Mr. Gary as a source had not intended to disclose Mr. Gary's identity as a cooperating witness at that point. *See id.* at 66.

On September 30, 1996, and November 7, 1996, the FBI reimbursed Mr. Gary $13,458.93, and $333.96, respectively, for expenses Mr. Gary incurred as part of his undercover work.[4] Def.'s App. at 29–32, 36–

---

and assumed to be true for the purposes of the pending motions. These facts are drawn mainly from the amended complaint, proposed findings of uncontroverted fact ("PFUF") filed by both parties, and documents contained in the appendix to defendant's supplemental motion to dismiss plaintiffs' amended complaint or, in the alternative, for summary judgment, "Def.'s App.," and the appendix to plaintiffs' opposition to defendant's motion, "Pls.' App."

4. Reimbursement for expenses incurred as part of Mr. Gary's undercover work, as distinct from payments to compensate Mr. Gary for business losses resulting from such work, was explicitly authorized by applicable FBI manuals. Def.'s App. at 29–43, 133–48.

43. On November 19, 1996, Special Agent Lane, with input from Mr. Gary, drafted a memorandum to request that a monthly stipend be paid to Mr. Gary. *Id.* at 15, 75, 83, 97; Pls.' App. at 125. Approval to pay such a stipend, however, was never obtained from any FBI official with authority to approve such a request. Def.'s App. at 97.

Special Agent Lane's November 19, 1996 memorandum requested a monthly stipend of $6,200 for Mr. Gary, and stated:

[S]ince [Mr. Gary's] role as an "informant" has been publicly exposed, his bond business, Howard V. Gary, and Associates, has virtually failed. Due to the widespread publicity afforded the Green Palm investigation, and [Mr. Gary's] role in that case, [Mr. Gary] has been blacklisted by every municipality and county government with which his firm had previously done business. In a meeting with [Mr. Gary] and his attorney on 11/7/96, [Mr. Gary] laid out his financial condition and requested assistance from the FBI. Inasmuch as [Mr. Gary's] loss of income derives essentially from his status as a cooperator, it is requested that a monthly payment for expenses be made to [Mr. Gary] to enable him to sustain himself in South Florida until such time as his cooperation is no longer needed.

Pls.' App. at 125–26. Special Agent Lane noted that AUSA Bruce Udolf had been briefed on Mr. Gary's circumstances and fully supported the requested payment. *Id.*

On December 18, 1996, AUSAs Udolf and Butler held a meeting with Special Agent Favitta, Mr. Raben and Mr. Gary. Def.'s App. at 18–19. At that meeting, Mr. Raben raised Mr. Gary's concern that his firm had lost a large amount of money due to the timing of the Montenay bond deal and the undercover investigation. *Id.* at 19. Mr. Raben requested compensation for the money Mr. Gary claimed to have lost. *Id.* AUSAs Udolf and Butler advised Messrs. Gary and Raben that the Department of Justice

was evaluating Mr. Gary's situation and that no determination had been made as to whether or not the Government would compensate Mr. Gary for his losses at that time. *Id.*

In a letter to AUSA Butler dated January 2, 1997, Mr. Raben inquired, in part:

[H]as the United States Attorney's Office and the Federal Bureau of Investigation completed their determination as to whether Mr. Gary is eligible to receive a monetary stipend based upon the loss of business, reputation and/or prestige suffered by him and his company following the revelations in the media regarding his activities as a cooperating individual? Additionally, has a determination been reached as to whether Howard Gary & Company is eligible for reimbursement based upon losses in connection with Mr. Gary's cooperation with the United States in their investigation? If so, we would appreciate meeting with you to discuss your conclusions.

Def.'s App. at 20.

From December 18, 1996 until the spring of 1997, Mr. Gary provided information to the Government regarding losses for which he sought compensation. On May 22, 1997, Mr. Gary ceased being a cooperating witness for the Government in Operation Green Palm. *Id.* at 80. By letter dated May 22, 1997, Mr. Raben advised the United States Attorney's office that "Mr. Gary has elected to pursue the provision of the [July 3, 1996, plea agreement] entered between the parties which allows him to proceed to trial in the event charges are filed."[5] *Id.* at 21.

By resolution adopted May 19, 1998, the Board of County Commissioners of Miami—Dade County dropped Mr. Gary and M Securities from the county's underwriting pool. Pls.' App. at 131.

On July 7, 1998, Mr. Raben participated in an informal meeting with AUSA Richard Scrugs on the front steps of the United States District Courthouse in Miami, Florida.

5. The July 3, 1996 plea agreement specifically stated in ¶ 12: "Both parties understand and agree that in the event the Defendant fails to cooperate fully . . ., if he provides false or misleading information or testimony, or should decide not to plead guilty pursuant to this agreement, all promises and considerations contained herein will be considered null and void." Pls.' App. at 93.

During that meeting, Mr. Scrugs advised Mr. Raben that Mr. Gary "would be dealt with fairly by the Government." *Id.* at 137.

Later that month, Mr. Gary and his attorneys, Mr. Raben and Neil Sonnett, met with the United States Attorney, Thomas E. Scott, and a group of attorneys from the United States Attorney's office and agents from the FBI. They met to discuss Mr. Gary's willingness to become once again a cooperating witness for the Government. At the meeting, Mr. Gary's attorneys advised Mr. Scott of the promises that had allegedly been made to Mr. Gary regarding financial compensation. Pls.' App. at 42. Mr. Gary's attorneys also inquired about the status of their client's criminal case. *Id.* Mr. Raben's deposition testimony does not detail exactly what he and his co-counsel represented to Mr. Scott were the terms of the alleged agreement but, according to Mr. Raben, Mr. Scott promised that he would "personally review whether any promises had been made regarding reimbursement or compensation and that if promises had been made, the Government will investigate it and keep its word and do the right thing." *Id.* At that meeting, Mr. Scott also informed Mr. Gary and his attorneys that, after his cooperation was complete, the Government would either charge Mr. Gary with a felony, a misdemeanor, or not at all. Def.'s App. at 84, 87, 92.

On July 23, 1998, AUSA Nucci met with Mr. Gary, Mr. Sonnett and Mr. Raben. Def.'s App. at 24–25. Mr. Gary agreed to make a proffer to the United State Department of Justice pursuant to the terms and conditions set forth in a letter dated that same day, and signed by all four individuals. *Id.* The letter provided Mr. Gary direct use immunity against the use in criminal proceedings of any truthful statements he made, but contained no promise by the Government to reimburse Mr. Gary for business losses he might suffer as a result of his cooperation in Operation Green Palm. *Id.* The letter stated, "This constitutes the entire agreement be-

tween you and the government. No other promises, agreements or inducements have been made in connection with your statements or testimony." [6] *Id.* at 25.

In a letter to AUSA Nucci dated August 4, 1998, Mr. Raben stated:

We were advised by your office that it would seek the continued cooperation of Howard Gary as it pertains to pending indictments in this district. The purpose of this letter is to ratify an agreement entered into between the parties on July 23, 1998, as it pertains to all future cooperation rendered by Mr. Gary until such time as the parties enter into a more formal agreement. In that vein, we would ask that the United States agree that the terms and conditions of the July 23rd agreement shall remain in force and effect and govern all future conversations between Mr. Gary and your office, or law enforcement officials, until such time as a supplemental agreement is entered. Mr. Gary will continue to render truthful assistance to the United States of America under the umbrella of that July 23rd agreement. We would appreciate your acknowledging this agreement by signature below, and returning a signed copy to this office by facsimile transmission.

Def.'s App. at 26. AUSA Nucci signed and returned the letter, as requested by Mr. Raben. *Id.*

Subsequent to the meeting with Mr. Scott in July 1998, Mr. Raben testified, two AUSAs advised him that a decision on Mr. Gary's compensation for business losses would have to await the conclusion of criminal proceedings related to Operation Green Palm because the trial prosecutors did not want to have to disclose such an arrangement in the discovery phase of any criminal proceeding. Raben Tr. 174:18–178:25, 200:1–21, Pls.' App. at 42–44.

In August 1999, Mr. Gary testified on behalf of the Government in *United States v.*

---

**6.** Plaintiffs do not deny that the Government made no promises in its July 23, 1998, letter to compensate Mr. Gary for his losses. Plaintiffs, however, contend that the purpose of the letter was merely to facilitate the Government's interview of Mr. Gary to get an understanding of his anticipated testimony in an upcoming trial. Pls.' App. at 43. The letter, according to Mr. Raben and Mr. Sonnett, did not relate to the alleged promises regarding financial compensation. *Id.* at 43, 75–78; Pls.' Resp. to Def.'s PFUF at 5–6.

*James C. Burke, et al.*, Case No. 98–003–CR–Davis (Aug. 23, 1999 S.D. Fla.). Pls.' App. 79–84. During his testimony, Mr. Gary affirmed that the Government had promised him, among other things, that it would compensate him for losses arising from the Montenay bond transaction and for losses that resulted from other "business problems" he experienced as a result of his cooperation. *Id.* at 84.

On January 31, 2000, Mr. Raben sent a letter to Mr. Scott in an attempt to resolve the outstanding financial matters regarding the Government's alleged promises to compensate Mr. Gary. *Id.* at 149. First Assistant United States Attorney Guy Lewis sent a reply to Mr. Raben on February 7, 2000 indicating that the Government was continuing to review the matter, and that on completion of its review, the Government would respond to Mr. Raben. *Id.* at 150.

On or about October 25, 2001, Operation Green Palm and the criminal trials arising out of the investigation requiring Mr. Gary's testimony were concluded. Am. Compl. ¶ 26. Mr. Gary was never prosecuted for any criminal activity identified in the July 3, 1996, plea agreement or for any other actions concerning or relating to Operation Green Palm taken by Mr. Gary prior to his cooperating with the Government. *See* Def.'s PFUF at 14–15; Pls.' Resp. to Def.'s PFUF at 22; Def.'s App. at 88.

### *DISCUSSION*

The Government argues that plaintiffs' amended complaint should be dismissed in its entirety because the contract and taking claims set forth therein accrued more than six years before the original complaint was filed. Def.'s 10/20/03 Reply at 1–16. The Government also argues that this court lacks jurisdiction to hear plaintiff Gary's breach of contract claims because those claims are premised upon a purported contract entered into by the United States in its sovereign capacity, for which there is no waiver of sovereign immunity. Def.'s Supp. Mot. at 2. In the alternative, the Government asserts

that it is entitled to summary judgment on plaintiff[7] Gary's breach of contract claims because the individuals alleged to have contracted with Mr. Gary lacked the authority to contractually obligate the funds of the United States Treasury. *Id.* The Government also seeks summary judgment on plaintiffs' Fifth Amendment taking claims on the ground that they are based on an alleged breach of an agreement to keep Mr. Gary's role in a criminal investigation confidential, and the damages plaintiffs argue they have suffered—loss of business—are consequential damages that are not compensable pursuant to the Fifth Amendment. *Id.*

### I. Standard of Review on Motion to Dismiss for Lack of Subject Matter Jurisdiction

The Court must address the issue of subject matter jurisdiction before any others, *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir.1994), and it must dismiss a complaint "when it lacks the statutory or constitutional power to adjudicate the case." *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir.1996). However, when this court hears such a jurisdictional challenge, "its task is necessarily a limited one." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "The issue is not whether plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.*

The court must accept as true the facts alleged in the complaint, and must construe such facts in the light most favorable to the pleader. *See Henke v. United States*, 60 F.3d 795, 797 (Fed.Cir.1995) (holding that courts are obligated "to draw all reasonable inferences in plaintiff's favor"); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). "If however, the motion challenges the truth of the jurisdictional facts alleged in the complaint, the court may consider relevant evidence in order to resolve the factual dispute." *McDonald v. United States*, 37 Fed.Cl. 110, 113 (1997); *Moyer v.*

---

7. As used herein and unless otherwise noted, the term "plaintiff" in the singular shall refer to

plaintiff Howard V. Gary.

*United States,* 190 F.3d 1314, 1318 (Fed.Cir. 1999) ( "[f]act-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint ... are challenged."); *Reynolds,* 846 F.2d at 747. Once the court's subject matter jurisdiction is put into question, it is "incumbent upon [the plaintiff] to come forward with evidence establishing the court's jurisdiction. [The plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." *Reynolds,* 846 F.2d at 748; *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936) ("[i]f [plaintiff's] allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof.").

## II. Statute of Limitations

"Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (2000). Because the six-year statute of limitations "is a jurisdictional requirement attached by Congress as a condition of the Government's waiver of sovereign immunity ... [it] must be strictly construed." *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1576–77 (Fed.Cir.1988); *see also Broughton Lumber Co. v. Yeutter,* 939 F.2d 1547, 1552 (Fed.Cir. 1991) ("waivers of sovereign immunity are to be strictly construed").

## III. The Facts Alleged in Plaintiffs' Original Complaint Are Not Judicial Admissions

■ The Government argues that according to the original complaint, plaintiffs' breach of contract and taking claims accrued no later than "mid-to-late 1996," when the Government allegedly "leaked certain information concerning Plaintiff Howard V. Gary's involvement in the [G]overnment's investigative activities to the press. Suddenly, and as a direct result of the public's knowledge of Mr. Gary's cooperation with the Gov-

ernment, [p]laintiffs began to suffer financial losses." Compl. ¶ 18. If the breach and the taking occurred in mid-to-late 1996, the Government argues, the Court would lack jurisdiction to hear plaintiffs' claims because their original complaint was filed on May 21, 2003—more than six years after the claims accrued.

The Government contends that in the amended complaint plaintiffs changed their factual allegations to avoid statute of limitations issues. With respect to the contract claim, plaintiffs stated that promises to compensate Mr. Gary for business losses sustained as a result of his cooperation extended from July 1996 until October 2001, when Operation Green Palm concluded. Am. Compl. ¶¶ 11–17, 25, 26. With respect to the taking claims, plaintiffs alleged "sometime after this information concerning Mr. Gary's involvement in the Government's investigation became public knowledge, the business began to suffer." Am. Compl. ¶ 20. "M Securities began to be blacklisted by the municipal and county governments with which it had previously done business. This did not happen overnight, however. And, in many instances it took longer for jurisdictions outside of Florida to stop using plaintiffs for their bond work than it did local governments." *Id.* ¶ 21. The Government argues that the allegations in plaintiffs' amended complaint seeking to establish that their claims accrued within the six-year statute of limitations period are to no avail because the allegations in plaintiffs' original complaint constitute binding judicial admissions of fact.[8] Def.'s 10/20/03 Reply at 5–6. Because plaintiffs are bound by the facts as alleged in their original complaint, the Government argues, the Court should dismiss plaintiffs' taking and contract claims on statute of limitations grounds.

RCFC 15(a) states, in pertinent part, that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." In

---

**8.** " 'A judicial admission is a 'formal act, done in the course of judicial proceedings, which waives or dispenses with the production of evidence, by conceding for purposes of litigation that the proposition of fact alleged by the opponent is true.' ' " *Stelco Holding Co. v. United States,* 44 Fed.Cl. 703, 710 n. 12 (1999) (quoting *Int'l Paper Co. v. United States,* 39 Fed.Cl. 478, 482 (1997)).

this case, plaintiffs filed a motion for leave to file an amended complaint on October 1, 2003. In their motion, plaintiffs stated that "additional facts have come to light through document reviews and personal interviews," and that they had "contacted counsel [for the Government], who has consented to this motion." *Id.* Judge Firestone granted plaintiffs' motion on October 7, 2003.

" 'A pleading that has been amended under Rule 15(a) supercedes the pleading it modifies .... Once an amended pleading is interposed, the original pleading no longer performs any function in the case ....' " *Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1365 (Fed.Cir.2000) (quoting CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, 6 FEDERAL PRACTICE AND PROCEDURE § 1476 (2d ed.1990)). Once plaintiffs filed their amended complaint, it superceded their original complaint. The Court, therefore, may not construe the allegations in plaintiffs' original complaint as judicial admissions, nor may the Government rely upon those allegations as the basis for its motion to dismiss on statute of limitations grounds.

### IV. The Court Lacks Jurisdiction Over Plaintiffs' Taking Claims Because The Facts Show That, Notwithstanding the Allegations in Plaintiffs' Amended Complaint, Those Claims Accrued More Than Six Years Before the Plaintiffs Filed Their Original Complaint

As discussed *supra* n. 1, plaintiffs asserted at oral argument that the contract claims belong to Mr. Gary, while the taking claim belongs to M Securities. Tr. at 74–76. However, plaintiffs were not so precise in their prior pleadings and memoranda, appearing instead to treat Mr. Gary and his company as each asserting taking claims. *See, e.g.,* Am. Compl. ¶¶ 44–47. Accordingly, the Court has proceeded on the assumption that Mr. Gary and M Securities are each asserting individual taking claims based on the same set of facts. *See id.*

■ "[A] takings claim accrues when 'all events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their exis-

tence.' " *Boling v. United States*, 220 F.3d 1365, 1370 (Fed.Cir.2000) (quoting *Hopland Band of Pomo Indians*, 855 F.2d at 1577). It is not necessary, however, that the damages from the alleged taking be complete and fully calculable before the cause of action accrues. *Fallini v. United States*, 56 F.3d 1378, 1382 (Fed.Cir.1995) (citing *Columbia Basin Orchard v. United States*, 116 Ct.Cl. 348, 356–57, 88 F.Supp. 738, 739 (1950)). "The court determines whether the pertinent events have occurred under an objective standard." *McDonald v. United States*, 37 Fed.Cl. 110, 114 (1997) (citing *Fallini*, 56 F.3d at 1380). Thus, a plaintiff need not possess actual knowledge of all relevant facts in order for a cause of action to accrue. *Fallini*, 56 F.3d at 1380.

■ Plaintiffs argue that they were not required to file their claim until "the conclusion of those events which resulted in the taking, in this case within six years after 1999." Pls.' Opp'n to Def.'s Supp. Mot. to Dismiss Pls.' Am. Compl. or, in the Alternative, Mot. for Summ. J. ("Pls.' Opp'n") at 32–33 (citing *United States v. Dickinson*, 331 U.S. 745, 748, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947)). It appears that plaintiffs alleged 1999 as the accrual date based on the mistaken assertion in the amended complaint at ¶ 21 that the Board of County Commissioners of Miami–Dade County, by resolution, removed Mr. Gary and M Securities from the county's underwriting pool in 1999. That resolution was in fact adopted on May 19, 1998. Pls.' App. at 131. The resolution was adopted "in light of the reported actions taken by NASD," which included imposition of a fine and suspension upon "an executive of" M Securities. It recited that M Securities was "currently under suspension from the County's underwriting pool as a result of certain allegations involving one of its principals, Howard Gary, with respect to a federal investigation known as Operation Greenpalm." *Id.* As discussed below, however, plaintiffs' taking claims accrued prior to the adoption of the 1998 resolution.

In this case, plaintiffs have alleged that Mr. Gary's bond underwriting "business depended upon plaintiffs' reputation and good standing with public officials" who made deci-

sions about the underwriting of municipal bond issuances. Am. Compl. ¶ 19. The revelation of Mr. Gary's identity as a cooperating witness/informant caused various local governments to stop doing business with him. *See id.* ¶¶ 20–21, 46. Mr. Gary's role as an informant was "publicly exposed" in a newspaper article published on September 26, 1996.[9] Def.'s Resp. to Pls.' PFUF at 2; Pls.' App. at 125. As mentioned above, Mr. Gary's role, as a cooperating witness and as a participant in the alleged underlying criminal activity, was also described in an Information filed against Miller Dawkins on October 9, 1996. Pls.' App. at 116–24. As a result of these disclosures, by November 7, 1996, Mr. Gary "ha[d] been blacklisted by every municipality and county government with which his firm had previously done business," and "his bond business, Howard V. Gary and Associates, ha[d] virtually failed." Pls.' App. at 125–26. Thus, at least as of November 7, 1996, "all events which fix the government's alleged liability ha[d] occurred," *i.e.*, the disclosure of Mr. Gary's informant status, his blacklisting by municipal and county governments, and the failure of his business.[10] *Boling v. United States,* 220 F.3d at 1370. Mr. Gary clearly was aware of these events when he and his attorney "laid out his financial condition" in a meeting with Special Agent Alan Lane on November 7, 1996. Pls.' App. at 125–26. Thus, plaintiffs' taking claims accrued, at the latest, by November 7, 1996, more than six years before the filing of the original complaint on May 21, 2003.

Accordingly, plaintiffs' taking claims are time-barred and the Court, therefore, lacks jurisdiction to consider them.

**9.** As noted in the text, the Government cites to a September 26, 1996 article in the *Miami Times* as the date Mr. Gary's role as an informant was first "publicly exposed." Def.'s Resp. to Pls.' PFUF at 2; Pls.' App. at 125. However, an article published September 20, 1996, in the *Miami Herald* detailed Mr. Gary's role as an informant and reported that when Mr. Gary, a former Miami City Manager, "was caught" in Operation Green Palm "he agreed to cooperate." Lisa Getter, Tom Bubocq, Gail Epstein, *Miami Bribe Probe Widens Ex–City Manager Informs on Metro Commissioner,* MIAMI HERALD, September 20, 1996 at 1A, *available at* 1996 WLNR 2905299; *See* Pls.' App. at 66; Am. Compl. ¶ 20.

## V. The Court Lacks Jurisdiction to Hear Mr. Gary's Contract Claims

The Government contends that the contractual relationship alleged in Counts I and II of the amended complaint was entered into by the Government "solely in its sovereign capacity" and that therefore this Court cannot adjudicate plaintiff's contract claims. Def.'s Supp. Mot. at 8; *see Kania v. United States,* 227 Ct.Cl. 458, 650 F.2d 264 (1981); *Sadeghi v. United States,* 46 Fed.Cl. 660, 662–63 (2000). In that regard, the Government assumes "for purposes of this motion only, that Mr. Gary correctly asserts that the United States entered into a contractual relationship with him." Def.'s Supp. Mot. at 8.

### A. *Sovereign Capacity*

This Court's subject matter jurisdiction under the Tucker Act extends to "claims against the United States founded ... upon any express or implied contract with the United States." 28 U.S.C. § 1491 (2000). But, the jurisdiction of this Court is limited to situations in which the Government acts in its non-sovereign capacity. *Silva v. United States,* 51 Fed.Cl. 374, 377, *aff'd,* 51 Fed. Appx. 12 (Fed.Cir.2002) (unpub.). That is, the Government has consented to be sued in this court only where "the sovereign steps off the throne and engages in the purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves." *Kania,* 227 Ct.Cl. at 464, 650 F.2d at 268.

The agreement at issue in this case is not the July 3, 1996 plea agreement. Instead, the pertinent contract is the alleged agree-

**10.** Quoting from Special Agent Lane's November 19, 1996 memorandum of his November 7 meeting with Mr. Gary and his attorney, Pls.' App. at 125–26, plaintiffs stated in paragraph 18 of their original complaint, that "[t]he FBI recognized that as soon as Mr. Gary's role was publicly exposed 'his bond business virtually failed' and Plaintiffs were 'blacklisted by every municipality and country [sic] government with which [they] had previously done business,' in short that the United States had 'taken' Mr. Gary's business."

ment between plaintiff and the Government in which the Government promised that it would compensate plaintiff for any business losses that he sustained as a result of his cooperation in the undercover investigation. On its face, this is not the type of transaction that "private parties, individuals or corporations also engage in among themselves." *Kania*, 227 Ct.Cl. at 464, 650 F.2d at 268. Rather, the Government entered into this agreement "for the purpose of furthering undercover law enforcement operations." *Silva*, 51 Fed.Cl. at 377. Although this agreement was separate from Mr. Gary's plea agreement, "these law enforcement operations are activities of the criminal justice system, activities that, without question, lie 'at the heart of sovereign action.'" *Id.* (quoting *Sadeghi*, 46 Fed.Cl. at 662). As stated in *Silva*,

> If, as the former Court of Claims has held, it is unreasonable to hold that, in enacting the Tucker Act, the Congress intended this Court to intervene in the conduct of criminal trials, *Kania*, 227 Ct.Cl. at 466, 650 F.2d 264 (citing *United States v. Jones*, 131 U.S. 1, 9 S.Ct. 669, 33 L.Ed. 90 (1889)), it is equally untenable to suppose that, barring some unusual circumstance, Congress intended this Court to possess jurisdiction over a claim for breach of an agreement entered into by the Government for the purpose of investigating and successfully prosecuting criminal conduct . . . .

51 Fed.Cl. at 378. This Court generally lacks jurisdiction in cases such as this where the contract claims "aris[e] out of sovereign functions such as the criminal justice system." *Id.*

The fact that the Government has acted in its sovereign capacity, however, is not necessarily fatal to plaintiff's claim:

> If the Government has entered into agreements in its capacity as a sovereign, then this Court may still possess jurisdiction if a court can find "specific authority . . . to make an agreement obligating the United States to pay money, and spelling out how in such a case the liability of the United States is to be determined."

*Silva*, 51 Fed.Cl. at 377 (quoting *Kania*, 227 Ct.Cl. at 465, 650 F.2d at 268). The require-

ment that the court find specific authority to make an agreement obligating the United States to pay money and spelling out how the liability of the United States is to be determined is necessary because "the role of the judiciary in the high function of enforcing and policing the criminal law is assigned to the courts of general jurisdiction and not to this court." *Kania*, 227 Ct.Cl. at 465, 650 F.2d at 268; *Sanders v. United States*, 252 F.3d 1329, 1335 (Fed.Cir.2001). Without a showing that the government agent possessed the specific authority described in *Kania*, this Court has held that it lacks subject matter jurisdiction over agreements made in the course of criminal proceedings, such as plea agreements, immunity agreements, and witness protection agreements. *Silva*, 51 Fed.Cl. at 377 (citing *Sadeghi*, 46 Fed.Cl. at 662; *Drakes v. United States*, 28 Fed.Cl. 190 (1993); *Grundy v. United States*, 2 Cl.Ct. 596 (1983); *Kania*, 227 Ct.Cl. at 465, 650 F.2d at 268). For the reasons set forth below, plaintiff has failed to demonstrate that the agents with whom he allegedly contracted had "specific authority . . . to make an agreement obligating the United States to pay money." *Kania*, 227 Ct.Cl. at 465, 650 F.2d at 268.

**B.  *Actual Authority***

██ "It is well established that the government is not bound by the acts of its agents beyond the scope of their actual authority." *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1432 (Fed.Cir.1998) (citing *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947)). Anyone asserting the existence of a contractual relationship with the United States has the burden of discovering whether the government agent has contracting authority. *See id.* Moreover, "anyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government, and this risk remains with the contractor even when the government agents themselves may have been unaware of the limitations on their authority." *Id.* (citation omitted).

██ Mr. Gary testified in deposition that his contract claim is based upon alleged

promises made by FBI Special Agents Hubert Alan Land and Gary Favitta, and Assistant United States Attorneys Bruce Udolf and Mary Butler. Gary Tr. 132:19–134:9, 173:6–174:19; 175:14–176:24, 205:8–206:12; Def.'s App. at 59–60, 64–65, 68–69. Mr. Raben, Mr. Gary's attorney, testified that Mr. Udolf and Ms. Butler were the individuals who allegedly made promises to cover Mr. Gary's losses and make him whole for business losses sustained as a result of his cooperation. Raben Tr. 82:5–83:25; Def.'s App. at 76.

Under the Federal Acquisition Regulation ("F.A.R."), "[c]ontracts may be entered into and signed on behalf of the Government only by contracting officers." 48 C.F.R. § 1.601(a). "Agency heads or their designees may select and appoint contracting officers and terminate their appointments." 48 C.F.R. § 1.603–1. "Contracting officers may bind the Government only to the extent of the authority delegated to them [and] ... shall receive from the appointing authority ... clear instructions in writing regarding the limits of their authority." 48 C.F.R. § 1.602–1(a). "Information on the limits of the contracting officers' authority shall be readily available to the public and agency personnel." *Id.*

The authority of FBI employees to make payments to informants is also described in the FBI Manual of Administrative Operations and Procedures ("Administrative Manual") and the Manual of Investigative Operations and Guidelines ("Investigative Manual"). Def.'s App. at 133–48. Without a "Cooperative Witness Agreement" between Mr. Gary and an authorized official from the FBI Office of the Chief Contracting Officer, there can be no authorized agreement between the FBI and a purported confidential witness, even if a plea agreement has been signed. *See* Administrative Manual, Part 2 § 6–5.2, Def.'s App. at 134 ("All documents which commit funds must be executed by a contracting officer at FBIHQ"); Administrative Manual, Part 2 § 6–11(5)(c), Def.'s App. at 137 ("contracts obligating funds of the FBI ... must be executed by a contracting officer at FBIHQ").

Anthony Baumann, who is Chief Contracting Officer for the Finance Division of the FBI in Washington, D.C., maintains a record of all FBI employees who presently have or who in the past have had contracting authority for the FBI. Baumann Dec. ¶ 6, Def.'s App. at 2. In his declaration, Mr. Baumann stated that none of the FBI individuals identified by Mr. Gary possessed authority to enter into any contract or contracts between the United States and plaintiffs. Baumann Dec. ¶ 6, Def.'s App. at 2. Indeed, counsel for plaintiffs conceded as much at oral argument. Tr. at 55–56.

Within the Office of the United States Attorney, the Attorney General's procurement authority is delegated to the Assistant Attorney General for Administration, who in turn, redelegated his contracting authority to James W. Johnston, Director of Procurement Services Staff, Justice Management Division, U.S. Department of Justice. Johnston Dec. ¶¶ 2–3, Def.'s App. at 4–5. Mr. Johnston's office maintains a listing of all DOJ employees within the various Offices of the United States Attorney who currently have or in the past have been delegated procurement authority as Contracting Officers through the Procurement Services Staff. Johnston Dec. ¶ 10, Def.'s App. at 7–8. A review of that list indicates that none of the employees from the United States Attorney's Office identified by Mr. Gary—including United States Attorney Thomas Scott—ever were appointed as Contracting Officers by him or anyone on his staff. Johnston Dec. ¶¶ 9–10, Def.'s App. at 7–8. Accordingly, with the exception of a possible limited Certified Invoice Procedure authority for purchases up to $2,500, *see* Johnston Dec. ¶ 4–5, Def.'s App. at 5, none of the DOJ employees identified by plaintiffs had the authority to commit the Government to the payment of funds.

Mr. Gary's two attorneys, Mr. Raben and Mr. Sonnett, were aware that additional procedures were required for payments to be made beyond the mere promises that were allegedly made by the individuals with whom they dealt. *See* Raben Tr. 72:16–73:25, Def.'s App. at 74–75 (agreeing that he "understood that there had to be an approval process by someone other than Mr. Lane or Mr. Favit-

ta"), 94:24–95:16, Def.'s App. at 78 (agreeing that he knew "that there was a process that had to go beyond Ms. Butler and Mr. Udolf" to authorize payment of government funds); Sonnett Tr. 53:4–54:2, Def.'s App. at 89 (stating that "it was always understood that they [Ms. Butler, Mr. Udolf, and Special Agents Lane and Favitta] could only make recommendations and somebody higher up was going to have to approve it").

In sum, Mr. Gary has adduced no evidence from which the Court could conclude that he accurately ascertained the authority of agents acting for the Government before he entered into any agreements or that any of those government agents were contracting officers. Thus, there is no basis upon which the Court could conclude that any of the government agents identified by plaintiffs had actual authority to bind the Government.

### C. *Implied Authority*

▮ Although apparent authority is insufficient to hold the Government bound by the acts of its agents, implied actual authority, like express actual authority, will suffice to bind it. *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed.Cir.1989) (citations omitted). "Authority to bind the Government is generally implied when such authority is considered to be an integral part of the duties assigned to a Government employee." *Id.* (quoting J. CIBINIC & R. NASH, FORMATION OF GOVERNMENT CONTRACTS 43 (1982)).

▮ Generally, however, contracting authority is not an integral part of the duties of federal law enforcement officers when dealing with confidential informants or cooperating witnesses since such officers can obtain authority from higher-ranking officers via established procedures to pay informants and witnesses for their services, with the result that contracting authority is not needed for the agents to perform their jobs. *See, e.g., Perri v. United States*, 53 Fed.Cl. 381, 401–02 (2002); *Cruz–Pagan v. United States*, 35 Fed.Cl. 59, 61–62 (1996); *Roy v. United States*, 38 Fed.Cl. 184, 190 (1997) (FBI special agents "can achieve their goal of inducing informant cooperation by following established [FBI] Manual payment procedures").

As for prosecutors, there is "no doubt" that they may "enter into plea agreements and pre-trial and post-trial release agreements with criminal defendants and that such agreements are specifically enforceable." *Sanders*, 252 F.3d at 1334. Such agreements involve a bargained-for exchange of consideration by which the Government obtains the certainty of a conviction in exchange for the criminal defendant's avoiding the risk of a harsher sentence. *United States v. Conway*, 81 F.3d 15, 17 (1st Cir.1996). Plaintiff, however, takes an expansive view of prosecutorial power, asserting that "the broad mandates of authority [of a United States Attorney] weigh heavily in finding that contracting authority is an integral part of the duties of [a United States Attorney]." Pls.' Opp'n at 20. However, plaintiff cites no case law, statutory, or regulatory authority to support that position.

The plaintiff in the *Bailey v. United States* cases unsuccessfully asserted same argument. In those cases, attorney F. Lee Bailey had agreed to help the United States repatriate the substantial, forfeitable assets of Bailey's client, a drug-trafficker who had concluded a plea agreement with the United States. *Bailey v. United States*, 54 Fed.Cl. 459, 464 (2002) ("*Bailey II* "); *see also Bailey v. United States*, 40 Fed.Cl. 449, 451 (1998) ("*Bailey I* "). Bailey believed that he had two contracts with the Government: an express oral contract that allowed him to take ownership of certain pharmaceutical stock owned by his client to cover his fees, and an implied-in-fact contract that permitted him to profit from the appreciation in value of that stock. *Bailey I*, 40 Fed.Cl. at 451–52. When the Government ultimately seized the stock, Bailey sued the United States under the Tucker Act. *Bailey I*, 40 Fed.Cl. at 453; *Bailey II*, 54 Fed.Cl. at 460, 483. Bailey argued that prosecutors had implied actual authority to bind the Government to a contract to pay money. *See Bailey II*, 54 Fed. Cl. at 503–04. The court, however, held that prosecutors could perform forfeiture duties without unlimited contracting power and dismissed the plaintiff's claim for failure to demonstrate that any prosecutor had authority to enter into contracts of the type plaintiff al-

leged. *See id.* at 506 (citing *Dolmatch Group, Ltd. v. United States,* 40 Fed.Cl. 431, 438 (1998)).

The statutory duties of a United States Attorney or of an AUSA, in pertinent part, are to prosecute all offenses against the United States, to represent the Government in civil actions concerning the United States, and to institute and prosecute proceedings for the collection of fines, penalties, and forfeitures. *See* 28 U.S.C. §§ 542, 547. The authority to make contracts for the payment of money, other than formal agreements to settle civil claims against the United States, *see* 28 C.F.R. §§ 0.160, 0.161, and 0.168, however, is not an integral part of those duties. Therefore, the agents with whom plaintiff allegedly contracted lacked the requisite implied authority to make an agreement obligating the United States to pay money.

### D. *Individual Ratification*

█ Ratification, as a general proposition under common law, is the "affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." *Schism v. United States,* 316 F.3d 1259, 1289 (Fed.Cir.2002) (quoting RESTATEMENT (SECOND) OF AGENCY § 82 (1958)). Individual ratification, in the government contracts context, is defined particularly as "the act of approving an unauthorized commitment by an official who has the authority to do so." 48 C.F.R. § 1.602–3(a). An "unauthorized commitment" is defined as "an agreement that is not binding solely because the government representative who made it lacked the authority to enter into that agreement on behalf of the Government." *Id.* It is government policy to discourage the use of ratification authority. 48 C.F.R. § 1.602–3(b)(1). Under the doctrine of individual ratification, a superior official must (1) possess authority to contract, (2) possess full knowledge of the material facts surrounding the unauthorized action, and (3) knowingly confirm, adopt, or acquiesce in the unauthorized action. *Leonardo v. United*

*States,* 63 Fed.Cl. 552, 560 (2005) (citations omitted); *Dureiko v. United States,* 62 Fed. Cl. 340, 353–54 (2004).

█ Generally speaking, the head of "contracting activity" [11] at an agency is the officer empowered to ratify an unauthorized commitment, unless a higher-ranking official is designated and, while the ratification authority may be delegated, it may never be delegated below the level of chief of the contracting office. 48 C.F.R. § 1.602–3(b)(2) and (b)(3). A designated ratifying official may exercise ratification authority only when (1) "[s]upplies or services have been provided to and accepted by the Government, or the Government otherwise has obtained or will obtain a benefit resulting from performance of the unauthorized commitment;" (2) "[t]he ratifying official has the authority to enter into a contractual commitment;" and (3) "[t]he resulting contract would otherwise have been proper if made by an appropriate contracting officer." 48 C.F.R. § 1.602–3(c).

Plaintiff has argued that United States Attorney "Scott and/or his superiors ratified the contract." Pls.' Opp'n at 21. Nowhere, however, has plaintiff provided any evidence that Mr. Scott or his superiors had the authority to enter into such a contractual commitment. Moreover, defendant's uncontradicted evidence in the form of the declaration by James W. Johnston, cited in Section V.B., *supra,* shows the opposite to be the case, *i.e.,* that U.S. Attorneys and AUSAs have been delegated limited procurement authority, up to $2,500, for litigation expenses, and that any procurement of goods or services costing more than that amount was required to be approved by a duly appointed Contracting Officer, and neither United States Attorney Scott nor any of the AUSAs with whom Mr. Gary dealt were ever appointed Contracting Officers. *See* Def.'s App. at 4–8. Thus, plaintiffs have failed to show that any individual with the requisite authority ratified the alleged agreement.

### E. *Institutional Ratification*

█ Plaintiff also contends that the alleged agreement was "institutionally rati-

---

11. "Contracting activity means an element of an agency designated by the agency head and dele-

gated broad authority regarding acquisition functions." 48 C.F.R. § 2.101.

fied." Pls.' Opp'n at 23–25. In the absence of specific ratification by an authorized official, institutional ratification occurs when the Government seeks and receives the benefits from an otherwise unauthorized contract. *Digicon Corp. v. United States,* 56 Fed.Cl. 425, 426 (2003); *see also Janowsky v. United States,* 133 F.3d 888, 891–92 (Fed.Cir.1998); *see also Silverman v. United States,* 230 Ct.Cl. 701, 710–11, 679 F.2d 865, 870 (1982). However, officials with ratifying authority must know of the unlawful promise, and such knowledge is a key element of an institutional ratification claim. *See Doe v. United States,* 58 Fed.Cl. 479, 486 (2003); *Perri v. United States,* 53 Fed.Cl. at 401–02; *see also City of El Centro v. United States,* 922 F.2d 816, 821 (Fed.Cir.1990).

■ One of the first cases in this circuit to deal with the issue of institutional ratification was *Philadelphia Suburban Corp. v. United States,* 217 Ct.Cl. 705 (1978). In that case, several Coast Guard firefighters, none of whom had formal contracting authority, used privately-owned flame-retardant foam to fight a boat fire, suggesting to the owners that the Coast Guard would pay for the cost of the foam. *Philadelphia Suburban,* 217 Ct.Cl. at 706. The Court of Claims held that implied authority or ratification exists when the Government has or takes the benefit of another's property and remanded the case for trial to determine the authority of Coast Guard personnel to make implied-in-fact contracts under the particular circumstances of the case. *Id.* at 707.

In a case decided four years later, the Court of Claims, in adopting the recommended decision of the trial judge, again analyzed ratification in the context of implied-in-fact contracts. *See Silverman v. United States,* 230 Ct.Cl. 701, 679 F.2d 865. In *Silverman,* a court reporter working on a subcontract to a court reporting company that had a contract with the Federal Trade Commission ("FTC") refused to tender transcripts of FTC proceedings to the FTC or the court reporting company until he received payment owed to him for work already done. *Id.,* 230 Ct.Cl. at 704–06, 679 F.2d at 867–69. The court reporter finally agreed to tender the transcripts after a sen-

ior FTC official convinced him to do so. *Id.* The official, who was not a contracting officer but who did have the authority to approve payment vouchers for contracts, had guaranteed payment in return for the transcripts. *Id.* The court reporter then sued to collect additional money he claimed was owed. *Silverman,* 230 Ct.Cl. at 708, 679 F.2d at 869. The court held that, "[b]y accepting the benefits flowing from the senior FTC official's promise of payment, the FTC ratified such promise and was bound by it," resulting in an implied-in-fact contract for only the particular transcripts that the FTC official had discussed with the court reporter, but not for any other transcripts. *Id.,* 230 Ct.Cl. at 710, 679 F.2d at 870–71.

In *City of El Centro,* the Federal Circuit distinguished between institutional ratification and the formation of implied-in-fact contracts. *See City of El Centro v. United States,* 922 F.2d 816 (Fed.Cir.1990). In that case, several illegal aliens sustained injuries from an automobile accident caused by their attempts to flee pursuing U.S. Border Patrol agents. *Id.* at 817–18. Emergency personnel brought the injured to a community hospital, where one of the hospital administrators asked a Border Patrol officer who would pay for the treatment. *Id.* at 818. The officer replied, "me and you," which the administrator claimed to have understood to mean that the Border Patrol would pay the costs. *Id.* The Claims Court held that the officer's statement created an implied-in-fact contract. *Id.* On appeal, the Federal Circuit reversed the Claims Court, holding that the Border Patrol officer could not form an implied-in-fact contract since he had no contracting authority. *Id.* at 820–21, 824. On the question of institutional ratification, the Federal Circuit distinguished *City of El Centro* from *Silverman* by noting that two key elements in *Silverman* were that (1) the FTC official had authority to approve vouchers for payment for goods and services, and (2) that FTC official made a promise to pay, which he then honored. *City of El Centro,* 922 F.2d at 821. The Border Patrol officer in *City of El Centro,* on the other hand, neither made a promise to pay, nor had any authority to bind the Government to pay, for any services. *Id.*

In *Janowsky,* decided in 1998, the Federal Circuit considered an appeal from an order by the Court of Federal Claims granting summary judgment to the United States in a case where a business owner and his wife sued the FBI to recover money for business losses the owner claimed to have suffered as a result of his cooperation in a sting operation. *Janowsky,* 133 F.3d at 889–90. The owner alleged that FBI agents had orally promised to indemnify him for losses. *Id.* at 889. The owner's attorney subsequently drafted an indemnity agreement, but the FBI found it unacceptable and did not sign it. *Id.* Janowsky sued the United States, alleging breach of an implied-in-fact contract and argued that, under *Silverman,* the Government could ratify its agents' unauthorized, prior promises and, in fact, did so by allowing the sting operation to proceed and by retaining the benefits of that investigation. *Janowsky,* 133 F.3d at 891. The Government argued that *City of El Centro* required that there be a promise by an official with power to bind the Government. *Id.* The Federal Circuit analyzed the cases discussed *supra,* focusing on the receipt, or lack thereof, of benefits by the Government in each case, and held that the lower court had erred by failing to consider whether the Government had ratified the indemnity promise by receiving benefits from the business owner's continued cooperation. *Id.* at 891–92.

The Court of Federal Claims has generally construed these cases to mean that "knowing acceptance of benefits by those empowered to bind the [G]overnment can result in ratification of the unauthorized official's promise." *Perri,* 53 Fed.Cl. at 401 (quoting *Janowsky v. United States,* 23 Cl.Ct. 706, 715–16 (1991)) (emphasis omitted). Knowledge by officials, who are empowered to ratify agreements, of all the facts related to the unauthorized action, "is the key distinguishing factor in all cases discussing institutional ratification." *Doe v. United States,* 58 Fed.Cl. 479, 486 (2003). Common sense requires this interpretation. As the Federal Circuit observed in *City of El Centro,* "The United States Government employs over 3 million civilian employees. Clearly, federal expenditures would be wholly uncontrollable if Government employees could, of their own volition,

enter into contracts obligating the United States." *City of El Centro,* 922 F.2d at 820. By the same reasoning, it cannot be the case that low-ranking Government employees could contractually obligate the United States under an institutional ratification theory merely by accepting benefits from a vendor. For an unauthorized promise to be binding under the doctrine of institutional ratification, an official with the power to ratify must know the material facts relating to the acceptance of the benefits and must acquiesce in their acceptance.

Plaintiff, however, has not adduced evidence that any officials with authority to ratify an unauthorized commitment knew of and acquiesced in any alleged promise to reimburse Mr. Gary for business losses he suffered as a result of his participation in Operation Green Palm. According to plaintiff, soon after he signed his July 3, 1996, plea agreement, officials at the Department of Justice, including potentially the FBI Director, were made aware of Operation Green Palm; Mr. Gary's past, present, and anticipated role in the operation; and the potential impact of the operation, via the "Group Undercover Operation Proposal." *See* Pls.' Opp'n at 25 n. 31; *see also* Pls.' App. at 95–115. However, the undercover operation proposal, dated August 2, 1996, contained no mention of any agreement to compensate Mr. Gary for business losses he might suffer as a result of his participation as a cooperating witness/informant in Operation Green Palm. Similarly, the letter, dated July 30, 1996, from United States Attorney Keefer to the FBI Director, which described the proposed operation, did not mention any such agreement. Pls.' App. at 96. Thus, even if one were to assume that the undercover operation proposal was submitted to the Director of the FBI, there is nothing in that document that would establish any kind of institutional knowledge of any promise to make Mr. Gary whole for business losses sustained as a result of his cooperation.

As noted earlier, Mr. Gary's criminal defense attorney, Peter Raben, testified at his deposition that the individuals he recalled who had promised to compensate Mr. Gary for business losses were AUSAs Butler and

Udolf. Raben Tr. 82:5–83:25, Def.'s App. at 76. Mr. Raben further testified that he had informed Mr. Scott in the July 1998 meeting about the promises to compensate Mr. Gary and that Mr. Scott had replied that he would personally review whether any promises had been made and, if so, then the Government would "keep its word and do the right thing." *See* Raben Tr. 172:16–173:8, Pls.' App. at 42. A letter to Mr. Raben dated February 7, 2000, from First AUSA Lewis informed Mr. Raben that the matter was still under review. Pls.' App. at 150. Plaintiff has not provided any evidence that any official who had ratification authority knew the material facts about the alleged unauthorized promise to make plaintiff Gary whole for business losses and acquiesced in Mr. Gary's continued provision of services in reliance upon that alleged promise. Lacking such evidence, plaintiff has failed to show that either the FBI or the Department of Justice ratified the alleged agreement.

Because plaintiff failed to demonstrate that the agents with whom he allegedly contracted had "specific authority . . . to make an agreement obligating the United States to pay money," *Kania*, 227 Ct.Cl. at 465, 650 F.2d at 268, this Court lacks subject matter jurisdiction over plaintiff's breach of contract claims.

### CONCLUSION

For the reasons stated, defendant's motion to dismiss Counts I, II and III of plaintiffs' amended complaint for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) is GRANTED. The Clerk of the Court is directed to enter judgment dismissing Counts I, II and III of plaintiffs' amended complaint.

IT IS SO ORDERED.