**Paul A. PIPER, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 09–193 C.

United States Court of Federal Claims.

Dec. 17, 2009.

500

Paul A. Piper, Sun City West, AZ, pro se.

Antonia R. Soares, United States Department of Justice, Washington, DC, for defendant.

### OPINION AND ORDER

SWEENEY, Judge.

Plaintiff is a retired federal employee who chose to retire from his position with the United States Army ("Army") and then reenter federal service as a Transportation Security Officer with the Transportation Security Administration ("TSA"). In making this decision, plaintiff relied upon the TSA's purported assurances that his status as a federal retiree would not affect the terms of his employment with the TSA. However, upon plaintiff's reemployment, the TSA began to deduct his retirement annuity from his pay. This unanticipated and substantial reduction in income forced plaintiff's resignation from the TSA. Plaintiff now seeks damages under a breach of contract theory for the TSA's alleged misrepresentations. Before the court are defendant's motion to dismiss for lack of jurisdiction and plaintiff's application to proceed *in forma pauperis*. As explained in more detail below, the court grants both motions.

1. The court derives the facts in this section from plaintiff's complaint ("Compl."), the exhibits attached to the complaint ("Pl.'s Ex."), plaintiff's opposition to defendant's motion to dismiss

## I. BACKGROUND[1]

Plaintiff Paul A. Piper was an officer in the Army, serving on active duty from 1963 to 1981, and in the active reserve from 1981 until his retirement in 1993. Compl. Ex. 2 at 2; Compl. Ex. 3 at 27–28. At the time of his retirement from the Army, he was employed by the United States Department of Defense ("Department of Defense"). Compl. Ex. 3 at 19. Upon leaving the Department of Defense in 1997, plaintiff accepted employment outside of the federal government. *Id.* at 14–19. He returned to federal employment in 2004, serving in several positions within the military, including Business Manager for the Army's Morale, Welfare, and Recreation Department at Fort Riley, Kansas, and Fort Hunter Liggett, California. *Id.* at 12–14.

In December 2005, while working at Fort Riley, plaintiff responded to a newspaper advertisement seeking applicants for Transportation Security Officer positions with the TSA, part of the United States Department of Homeland Security ("Department of Homeland Security"). Compl. Ex. 7 at 1. When discussing his application with the TSA's human resources department, he indicated that he would be joining the TSA as a retired military and civilian employee and inquired whether his retirement status would affect his application. Compl. ¶ 3. He was particularly concerned that retirees could not obtain employment with the federal government and that if he was able to obtain federal employment, his retirement annuity would be reduced. Compl. Ex. 7 at 1. Plaintiff was informed that his retirement status would not affect his application because the TSA's hiring process differed from other executive agencies. *Id.*; Compl. ¶ 3. To further assuage plaintiff's concerns, the TSA's human resources department referred him to the "TSA HR Orientation Guide," which provides:

Most Federal Government agencies are in the competitive civil service and are governed by regulations based on Title 5 of

("Opp'n"), the exhibit attached to defendant's reply in support of its motion to dismiss ("Def.'s Ex."), and plaintiff's surreply to defendant's motion to dismiss ("Surreply").

the U.S.Code. Like some other agencies, ... TSA's implementing statute put the agency outside of the competitive civil service....

....

Excepted service is defined as all positions in the executive branch of the Federal Government that are specifically excepted from the competitive service by statute, Executive Order, or [the United States Office of Personnel Management ("OPM")]. Examples of excepted service agencies include the ... TSA.... Excepted service agencies can use their own hiring systems and evaluation criteria to fill vacant positions.

Compl. Ex. 1 at 1–2.

With these assurances, plaintiff formally applied for a position with the TSA. Compl. ¶ 6; Compl. Ex. 7 at 1–2. He submitted Optional Form 306, "Declaration for Federal Employment," which contained information about his military service, and Standard Form 86, "Questionnaire for National Security Positions," which contained detailed information about his military service and prior federal employment. Compl. ¶¶ 4–5; Compl. Ex. 2; Compl. Ex. 3. Throughout the extended application process, plaintiff was never informed that his status as a retiree would have a negative effect on his sought-after employment with the TSA. Compl. Ex. 5 at 1; Compl. Ex. 7 at 2.

On November 7, 2006, the TSA notified plaintiff that he had successfully completed the requirements for "appointment" as a Transportation Security Officer and would therefore be placed in pool of candidates from which open positions would be filled. Compl. Ex. 4 at 1. Then, just over a month later, the TSA offered plaintiff "a contingent appointment in the excepted service for the position of Transportation Security Officer (Screener), SV–1802–D, effective January 21, 2007[,] at the Gunnison–Crested Butte

Regional Airport." *Id.* at 4. Plaintiff's appointment was contingent upon satisfactory results from a drug test, background investigation, and credit check. *Id.* Further, plaintiff was required to undergo a two-year trial period. *Id.* The offer letter did not address how plaintiff's retirement status would affect his pay. *Id.* at 4–5; Compl. ¶ 6; Compl. Ex. 7 at 2. Plaintiff accepted the offer of employment, Compl. Ex. 4 at 5, retired from his position with the Army, Compl. ¶ 6, and relocated from Fort Hunter Liggett, California to Gunnison, Colorado, Compl. Ex. 7 at 2. *See also* Compl. Ex. 5 at 2.

On January 25, 2007, the TSA issued a Standard Form 50, "Notification of Personnel Action" ("SF–50"),[2] reflecting plaintiff's excepted service appointment under the authority of Public Law 107–71, *i.e.*, the Aviation and Transportation Security Act. Def.'s Ex. 1 at 1; *see also id.* at 2 (noting that plaintiff had executed an appointment affidavit on January 22, 2007, and that plaintiff's appointment was subject to his successful completion of a two-year trial period). In the "Remarks" field, which spanned two pages, the TSA provided:

> As a reemployed annuitant, you serve at the will of the appointing officer.[3] Annual salary to be reduced by the amount of your retirement annuity and by further cost of living increases.... You are required to submit to the personnel office a copy of any subsequent notice from OPM of any changes in your gross annuity rate.

*Id.* at 1–2 (footnote added). Plaintiff avers that the TSA did not provide him with a copy of this SF–50. Surreply 3–4.

Approximately three months into his tenure as a Transportation Security Officer, plaintiff received a telephone call from the finance office at TSA Headquarters informing him that as a federal retiree receiving a retirement annuity, his pay would be reduced by the amount of his annuity. Compl. ¶ 7;

---

**2.** An SF–50 is a standard personnel form used across the federal government to record personnel actions. *Horner v. Acosta,* 803 F.2d 687, 689 n. 2 (Fed.Cir.1986).

**3.** In addition, the "Annuitant Indicator" code contained in box twenty-eight of the SF–50 reflected that plaintiff was a "[r]etired uniformed

service officer and reemployed FERS annuitant ... who is subject to salary offset." U.S. Office of Personnel Mgmt., *The Guide to Personnel Data Standards: Annuitant Indicator* 2 (2009), http://www.opm.gov/feddata/gp59/cpdf/annuit indicator.pdf.

Compl. Ex. 5 at 1; Compl. Ex. 7 at 2. He inquired as to why he was not provided with this information prior his acceptance of the offer of employment, but received no response. Compl. Ex. 7 at 2. He immediately contacted the Human Resources Specialist at the TSA office in Grand Junction, Colorado, Mae Pittman, who advised plaintiff to contact the director of the office, Rene Dhenin. Compl. ¶ 8. Mr. Dhenin explained to plaintiff that although the TSA had granted waivers to prevent the reduction of annuitants' pay in the past, it appeared that the practice had ended, and that there was nothing that he could do to assist plaintiff. Id.; Compl. Ex. 7 at 2.

Because the pay reduction made living in Gunnison, Colorado unaffordable for plaintiff, he was compelled to resign from the TSA. Compl. ¶ 9; Compl. Ex. 7 at 2. The TSA issued another SF–50 reflecting plaintiff's resignation, which was effective July 26, 2007. Compl. Ex. 5 at 3. Plaintiff then moved to Sun City West, Arizona, and sought, unsuccessfully, other employment. Compl. Ex. 7 at 2.

Plaintiff subsequently submitted a claim to the Administrator of the TSA for breach of contract under the Tucker Act, alleging that had the TSA informed him of the actual effect his retirement status would have on his Transportation Security Officer pay, he would not have retired from his position with the Army, accepted employment with the TSA, and moved to Colorado. Compl. Ex. 7 at 1–4. He thus sought from the TSA (1) the pay he would have received had he remained in his position with the Army; (2) the associated increase in retirement benefits; (3) reimbursement of expenses for the moves between California and Colorado and between Colorado and Arizona; and (4) damages for his pain and suffering. Id.; Compl. ¶ 11. Plaintiff's complaint was referred to the TSA's Office of Chief Counsel. Compl. Ex. 8 at 1. The Acting Deputy Chief Counsel denied plaintiff's claim, explaining:

> The courts have long recognized that federal government employees hold their positions by appointment and not by employment contract.... Consequently, as a former federal security screener employed

by the TSA, your relationship to TSA is best categorized as an appointment and not contractual. Because you had no contract of employment, your Tucker Act claim is without merit.

Id. (citations omitted).

Plaintiff next sought relief from all three of his representatives in Congress–Senators John McCain and Jon Kyl and Representative Trent Franks. Compl. ¶ 15; Compl. Ex. 9. The TSA responded to the congressional inquiries with letters indicating that plaintiff "joined TSA as a reemployed Federal annuitant and his salary was required to be offset by the amount of his Federal annuity." Compl. Ex. 9. Still lacking the relief he sought, plaintiff filed the instant action. As with the claim he submitted to the TSA, plaintiff seeks damages under the Tucker Act for the TSA's "failure to properly provide [him] the truth regarding [his] reemployment options" during the lengthy hiring process. Compl. ¶¶ 1–2. In particular, plaintiff seeks reimbursement for lost pay, relocation expenses for both moves, and housing expenses, as well as damages for "[t]rouble and medical trouble." Compl. Ex. 10; accord Compl. ¶¶ 16–17. Defendant has moved to dismiss plaintiff's complaint for lack of jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). The court has reviewed the parties' briefs and deems oral argument unnecessary.

## II. LEGAL STANDARDS

### A. RCFC 12(b)(1) Motion to Dismiss

In ruling on a motion to dismiss, the court assumes that the allegations in the complaint are true and construes those allegations in plaintiff's favor. Henke v. United States, 60 F.3d 795, 797 (Fed.Cir.1995). However, plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject matter jurisdiction. McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed.Cir.1988). The court may look to evidence outside of the pleadings to determine the existence of sub-

ject matter jurisdiction. *Land v. Dollar*, 330 U.S. 731, 735 & n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Reynolds*, 846 F.2d at 747. If the court concludes that it lacks subject matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

## B. Subject Matter Jurisdiction

 Whether the court has jurisdiction to decide the merits of a case is a threshold matter. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868). The parties or the court *sua sponte* may challenge the court's subject matter jurisdiction at any time. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006).

 The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). The waiver of immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969).

 The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (2006). However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed.Cir.1994) (en banc). Here, plaintiff alleges that the substantive source of jurisdiction is an employment contract with the TSA.

## C. Federal Government Employment

 It is well-settled that "Tucker Act jurisdiction may be premised on an employment contract, as well as on one for goods and services...." *Army & Air Force Exch. Serv. v. Sheehan*, 456 U.S. 728, 735, 102 S.Ct. 2118, 72 L.Ed.2d 520 (1982) (citing *United States v. Hopkins*, 427 U.S. 123, 126, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976) (per curiam)); *accord Kania v. United States*, 227 Ct.Cl. 458, 650 F.2d 264, 268 (1981) (noting that "[a] contract between [the] government and one of its employees is possible," but only if it is "specifically spelled out as a contract" and "made by a person having authority"). However, it is presumed that "absent specific legislation, federal employees derive the benefits and emoluments of their positions from appointment rather than from any contractual or quasi-contractual relationship with the government." *Chu v. United States*, 773 F.2d 1226, 1229 (Fed.Cir.1985). Consequently, if an individual's "employment was by 'appointment,' a breach of contract action against the government would be precluded." *Hamlet v. United States*, 873 F.2d 1414, 1417 n. 5 (Fed.Cir.1989). In other words, a federal employee's "relationship with the Government cannot be simultaneously governed by both an appointment and a contract." *Collier v. United States*, 56 Fed.Cl. 354, 356 (2003), *aff'd*, 379 F.3d 1330 (Fed.Cir.2004). To determine how an individual is employed by the federal government, a court must analyze the relevant statutes and regulations in light of the other evidence presented. *See Hopkins*, 427 U.S. at 130, 96 S.Ct. 2508.

## D. Statutory Context

Employment in the federal government's civil service system is governed by title 5 of the United States Code. *Scarnati v. Dep't of Veterans Affairs*, 344 F.3d 1246, 1247 (Fed. Cir.2003). The civil service "consists of all appointive positions in the executive, judicial,

and legislative branches of the Government of the United States," 5 U.S.C. § 2101 (2006), including positions in the competitive service and the excepted service, *id.* §§ 2102–2103. *See also id.* § 2105(a)(1) (noting that an "employee" in the civil service is "appointed"). The competitive service generally consists of all positions in the executive branch except those that are specifically excluded by statute. *Id.* § 2102(a). And, the excepted service generally consists of those positions that are not in the competitive service. *Id.* § 2103(a).

Congress created the TSA in 2001 to, among other things, shift the responsibility for screening airline passengers and their baggage to employees of the federal government. Aviation and Transportation Security Act, Pub.L. No. 107–71, §§ 101, 110, 115 Stat. 597, 597–604, 614–16 (2001) (codified as amended at 49 U.S.C. §§ 114, 44901 (2006)). Congress authorized the head of the TSA to, "[n]otwithstanding any other provision of law, ... employ, appoint, discipline, terminate, and fix the compensation, terms, and conditions of employment of Federal service for such a number of individuals ... necessary to carry out the screening functions" of the TSA. 49 U.S.C. § 44935 note; *accord id.* § 114(m)(1) (citing 49 U.S.C. § 106(*l*)(1)). It also authorized the TSA to use, with appropriate modifications, the personnel management system of the Federal Aviation Administration ("FAA"). *Id.* § 114(n) (citing 49 U.S.C. § 40122). The statute governing the FAA's personnel management system provided that the "provisions of title 5 shall not apply" to the system, "with the exception of ... *chapters 83–85*, 87, and 89, relating to retirement, unemployment compensation, and insurance coverage[.]" *Id.* § 40122(g)(2)(G) (emphasis added).

Chapters 83 and 84 of title 5 concern, respectively, the Civil Service Retirement System ("CSRS") and the Federal Employees' Retirement System ("FERS"). Both of these chapters provide that if an annuitant is reemployed in an appointive position in the federal government, his or her pay is reduced by the amount of the annuity. *See* 5 U.S.C. §§ 8344(a) (CSRS), 8468(a) (FERS).

However, both chapters also permit federal agencies to seek waivers of the annuity reduction provision from the OPM. *Id.* §§ 8344(i) (CSRS), 8468(f) (FERS). Waivers can be granted on a case-by-case basis if "there is exceptional difficulty in recruiting or retaining a qualified employee" for the position or if there is "an emergency involving a direct threat to life or property or other unusual circumstances." *Id.* §§ 8344(i)(1) (CSRS), 8468(f)(1) (FERS); *see also* 5 C.F.R. part 553 (2007) (containing the regulations implementing the waiver provisions).

In 2002, Congress transferred the TSA to the newly formed Department of Homeland Security. Homeland Security Act of 2002, Pub.L. No. 107–296, § 403, 116 Stat. 2135, 2178. The Department of Homeland Security, like the TSA before it, was authorized to create its own human resources management system. *Id.* § 841, 116 Stat. at 2229–34 (codified at 5 U.S.C. § 9701). Also like the TSA, the Department of Homeland Security was prohibited from overriding chapters 83 and 84 of title 5. *Id.* Accordingly, absent a waiver from the OPM, annuitants hired by the TSA or the Department of Homeland Security are subject to a reduction of pay in the amount of their annuities. With this statutory backdrop, the court turns to the specific and unfortunate circumstances of this case.

## III. DISCUSSION

As noted above, plaintiff contends that because he had entered into an employment contract with the TSA that was breached by that agency, this court possesses jurisdiction over his complaint. Accordingly, the decisive issue in this case is whether plaintiff served in the TSA by appointment or by contract. As dictated by the controlling precedent, the court begins its analysis by examining the facts in light of the relevant statutes.

### A. Plaintiff's Employment with the TSA Was by Appointment, Not Contract

Plaintiff was hired by the TSA under the authority of the Aviation and Transportation Security Act.[4] With limited exceptions that

4. Plaintiff suggests that he was not hired directly

by the TSA, but was instead hired by a third

are not relevant here, this statute expressly requires security screeners to be federal employees as defined in title 5 of the United States Code. *See* 49 U.S.C. § 44901 (citing 5 U.S.C. § 2105). The pertinent section of title 5 provides that federal employees are appointed to their positions. 5 U.S.C. § 2105(a)(1). Although the Aviation and Transportation Security Act indicates that the head of the TSA may both "employ" and "appoint" security screeners, which conceivably provides the TSA with the option to hire the security screeners by contract, "this option does not overcome the presumption of appointment. . . ." *Calvin*, 63 Fed.Cl. at 473. Thus, the relevant statutes strongly suggest that plaintiff held an appointive position with the TSA.

Other evidence before the court fully supports this conclusion. Plaintiff's qualification letter specifically stated that he had completed the requirements for "appointment" as a Transportation Security Officer and his offer of employment was for a "contingent appointment." These letters are devoid of language evidencing a contract of employment. Further, the SF–50 issued by the TSA upon plaintiff's hiring indicated that plaintiff was appointed to the excepted service, that he had executed an appointment affidavit, that he served at the will of the appointing officer, and that his appointment included a two-year trial period. Thus, the language of the SF–50 explicitly reflects the appointive nature of plaintiff's employment. *See also Horner*, 803 F.2d at 693–94 (noting that an executed SF–50 is one of the "usual indicia of civil service status" and is a necessary element of an employee's appointment).

Plaintiff's circumstances are similar to those of TSA security screener plaintiffs in other cases. For example, in *Calvin*, seven of the plaintiffs were purportedly promised higher base salaries than what was typically paid by the TSA to its screeners. 63 Fed.Cl. at 470. Although these plaintiffs received offers of conditional appointment setting forth those higher salaries, they ultimately received actual appointments providing for salaries at the normal lower rate. *Id.* The plaintiffs argued that they were entitled to the higher salaries because the offer letters were binding contracts that were breached by the TSA by paying them at a lower rate. *Id.* at 471. The Court of Federal Claims, analyzing the Aviation and Transportation Security Act, as well as the plaintiffs' offers of conditional appointment, appointment affidavits, and SF–50s, held that the plaintiffs had not overcome the presumption of appointment and that, therefore, the lower salaries applied.[5] *Id.* at 472–73.

Similarly, the TSA security screener plaintiff in *American Federation of Government Employees Local 1 v. Stone* alleged that he did not receive the salary set forth in his conditional appointment letter. 342 F.Supp.2d 619, 621 (N.D.Tex.2004). After remand by the United States Court of Appeals for the Fifth Circuit, the district court, using the same legal standards that the court applies in this case, rejected the screener's breach of contract claim and concluded that neither the relevant statutory language nor the conditional offer of appointment explicitly indicated that the screener was a contract employee. *Am. Fed'n of Gov't Employees Local 1 v. Stone*, No. Civ. 3:04–CV–1219–H, 2005 WL 2333620, at *1 (N.D.Tex. Sept.23, 2005). Specifically, the court held that "[n]o explicit mention of a contractual relationship is made in the relevant statute" and that it was "undisputed" that the screener's "conditional offer of employment indicated that it

party retained by the TSA to find qualified applicants. There is no evidence in the record supporting this suggestion. The court notes that when the TSA was created in 2001, it "undertook to perform all passenger screening operations beginning on November 19, 2002," and to "build up the necessary workforce," the TSA retained a number of outside companies "to hire screeners." *Calvin v. United States*, 63 Fed.Cl. 468, 470 (2005). However, plaintiff did not seek employment with the TSA until December 2005.

**5.** The court also concluded that discovery would not be material to the "pivotal issue" of whether the plaintiffs served by appointment or contract. *Calvin*, 63 Fed.Cl. at 474; *accord Federico v. United States*, 70 Fed.Cl. 378, 386 (2006) ("No amount of discovery could change the legal reality underlying plaintiff's claim that federal employees who serve by appointment may not bring contract claims regarding government positions held by appointment."). Similarly, to the extent that plaintiff seeks discovery here, his request is denied.

was one of conditional appointment and did not explicitly indicate that [the screener] was hired as a contract employee." *Id.*

It is readily apparent that the decisions in *Calvin* and *American Federation of Government Employees Local 1* support the court's conclusion—dictated by the relevant statutes and the evidence proffered by the parties concerning plaintiff's employment with the TSA—that plaintiff was employed with the TSA by appointment, and not by contract.[6] However, for the sake of completeness, the court addresses the other arguments raised, either expressly or by implication, by plaintiff.

## B. No Cognizable Claim of Misrepresentation Exists

First, plaintiff contends that like the TSA security screener plaintiffs in *Calvin* and *American Federation of Government Employees Local 1*, he was intentionally misled by the TSA regarding the terms of his employment during the hiring process. Specifically, plaintiff alleges that TSA personnel "lied" or "did not tell the truth" to him during the hiring process. Opp'n 4; Surreply 3–4. Claims based on misrepresentation, like those advanced by plaintiff, sound in tort. *See Fla. Keys Aqueduct Auth. v. United States,* 231 Ct.Cl. 911, 912 (1982) (noting that claims based on false representation and deceit sound in tort); *Elkins v. United States,* 229 Ct.Cl. 607, 608 (1981) (holding that claims based upon deception, falsification, misrepresentation, and concealment sound in tort); *Somali Dev. Bank v. United States,* 205 Ct.Cl. 741, 508 F.2d 817, 821 (1974) (explaining that claims based on negligent misrepresentation and wrongful inducement sound in tort). However, "[i]f contractual relations exist, the fact that the alleged breach is also tortious does not foreclose Tucker Act jurisdiction." *Fountain v. United States,* 192 Ct.Cl. 495, 427 F.2d 759, 761 (1970) (per curiam); *see also Fla. Keys*

*Aqueduct Auth.,* 231 Ct.Cl. at 912 (noting that when "there is privity of contract," allegations of false representation and deceit "often ha[ve] a contract as well as a tort aspect," and that as a result, the court possesses subject matter jurisdiction). Put another way, "[w]here ... a claim is based on a breach of contract[,] it is properly within the jurisdiction of this court even though it also alleges that defendant engaged in tortious conduct in breaching the contract." *Olin Jones Sand Co. v. United States,* 225 Ct.Cl. 741, 745 (1980).

In the instant case, the court has concluded that plaintiff was not contractually employed by the TSA. Thus, there can be no tortious breach of contract. Further, to the extent that plaintiff is pursuing an independent claim based on the TSA's alleged misrepresentations, plaintiff's claim sounds in tort and the court lacks jurisdiction to entertain it. *See* 28 U.S.C. § 1491(a)(1) (excluding claims sounding in tort from the jurisdiction of the Court of Federal Claims); *Alves v. United States,* 133 F.3d 1454, 1459 (Fed.Cir. 1998) ("To the extent that ... allegations sound in tort, the Court of Federal Claims lacks jurisdiction under the Tucker Act....").

## C. Plaintiff's Appointive SF–50 Is Valid

Next, plaintiff attempts to mitigate the effect of the contents of the initial, appointive SF–50 by suggesting that the form is fabricated or otherwise invalid. In support of this suggestion, plaintiff first contends that he never received a copy of the SF–50 and that the TSA's failure to provide him a copy of the SF–50 rendered it invalid. He then contends that the SF–50 must have been fabricated because the statements made by TSA personnel during the hiring process implied the existence of a waiver of the requirement that his pay be reduced by the amount of his retirement annuity-a contention that he argues is supported by Mr. Dhenin's state-

---

**6.** Although plaintiff attempts to distinguish *Calvin, American Federation of Government Employees Local 1,* and other decisions on the basis of his probationary status, such a distinction is of no import. Appointees who terminate their employment during a trial period are not retroac-

tively rendered contract employees; they are still deemed to have been appointed to their positions. Indeed, plaintiff's initial SF–50 indicated that plaintiff was both appointed to his position and required to serve a two-year trial period.

ments. Neither of plaintiff's contentions constitutes evidence that the SF–50 is invalid.

### 1. The TSA's Purported Failure to Provide Plaintiff With an Appointive SF–50 Does Not Invalidate the SF–50

 According to the procedures adopted by the OPM, agencies are required to provide newly hired employees with a copy of the SF–50 reflecting their appointment. U.S. Office of Personnel Mgmt., *Guide to Processing Personnel Actions* §§ 1–3(b)(1), 4–7 (2009), http://www.opm.gov/feddata/gppa/gppa.asp. However, as the United States Court of Appeals for the Federal Circuit noted in *Hardy v. Merit Systems Protection Board,* an SF–50 "is merely an administrative record of the accomplished action." 13 F.3d 1571, 1575 (Fed.Cir.1994). Thus, the issuance and receipt of an SF–50 is not the linchpin to federal employment. *See Grigsby v. U.S. Dep't of Commerce,* 729 F.2d 772, 775 (Fed.Cir.1984) (noting that "while an employee's appointment cannot exist without execution of the appropriate appointment form," the execution of such a form is not "a controlling or sufficient element of the appointment"). In the present case, assuming plaintiff is correct that he did not receive the appointive SF–50, the facts demonstrate that the TSA's failure to provide plaintiff with the form did not preclude plaintiff from beginning work or receiving pay. Therefore, it is logical to presume that the TSA actually issued the SF–50, even if it did not provide a copy of it to plaintiff. *Cf. U.S. Postal Serv. v. Gregory,* 534 U.S. 1, 10, 122 S.Ct. 431, 151 L.Ed.2d 323 (2001) (noting that "a presumption of regularity attaches to the actions of Government agencies"). Accordingly, the fact that plaintiff did not receive a copy of the SF–50 does not render the SF–50 invalid.

### 2. No Implied–In–Fact Contract Exists That Invalidates the SF–50

 Nor is the SF–50 invalidated by the statements of TSA personnel implying that a waiver existed such that plaintiff's pay would not be offset by his retirement annuity. In essence, plaintiff alleges that the representations of TSA personnel constitute an implied-in-fact contract. "An agreement implied in fact is 'founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *Hercules, Inc. v. United States,* 516 U.S. 417, 423, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (quoting *Balt. & Ohio R. Co. v. United States,* 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923)). Implied contracts with the United States can only be made by "an authorized agent of the government." *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1326 (Fed.Cir.1997); *accord City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990); *Kania,* 650 F.2d at 268. Moreover, parties entering into contracts with the United States bear the burden of determining whether the official purportedly acting on the United States' behalf has the requisite authority. *Fed. Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947) ("[A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority."). There is no evidence in this case that an employee of the TSA with the authority to bind the government informed plaintiff that he had been granted a waiver of the retirement annuity offset provisions.

Plaintiff's situation here is analogous to that of the plaintiff in *Troutman v. United States,* 51 Fed.Cl. 527 (2002). In *Troutman,* the plaintiff was repeatedly reassured by the local personnel representative of the hiring agency—the Immigration and Naturalization Service ("INS")—that a waiver had been obtained that would exempt his pay from a reduction in an amount equal to his federal retirement annuity. *Id.* at 529. The court recounted the plaintiff's allegations:

> In his complaint, plaintiff alleges that prior to accepting his position with INS, he spoke with Ms. Judy Forgey in the local INS personnel District Office in Houston, Texas to inquire whether "his status as a retired Internal Revenue Service (IRS) employee would cause any problem with his annuity or his pay." The plaintiff states that he was advised by Ms. Forgey that "the INS had secured a waiver to hire

retired Civil Service Employees, and that there would be no problem." After accepting and commencing employment as a temporary employee at INS, and after hearing that someone from the INS District Office in Dallas was inquiring regarding his annuity payments, the plaintiff again inquired of Ms. Forgey whether a waiver had been obtained which would exempt his pay from the annuity payment deduction of section 8344(a). According to plaintiff's complaint, once again, she informed him that "a waiver had been obtained for him and that no problem existed."

Also according to the plaintiff, when he began his position as a temporary INS District Adjudication Officer, he received his full pay as a GS–9, Step 10 employee for the fifteenth through twentieth pay periods of 1996. Commencing on the twenty-first and twenty-second pay periods of 1996, the INS began deducting from plaintiff's paycheck the amount he was due to receive under his retirement annuity. After discovering the deduction, the plaintiff twice contacted Ms. Forgey. Subsequently, according to the plaintiff, Ms. Forgey informed him that the INS had secured a waiver for reemployed INS annuitants, but not reemployed IRS annuitants or other retired federal agency annuitants. Thereafter, plaintiff promptly resigned from his position.

*Id.* at 529–30. The court held that the plaintiff was "not entitled to rely on the apparent authority" of the local personnel representative regarding the existence of a waiver and that, consequently, the local personnel representative's statements did not convert the plaintiff's appointment, as reflected in an SF–50, into an express or implied-in-fact contract for employment.[7] *Id.* at 535. If the facts in *Troutman,* where the plaintiff was specifically advised by the INS that he had been granted a waiver by the agency prior to his acceptance of employment, failed to establish the existence of an implied-in-fact

contract that trumped an appointive SF–50, then it is axiomatic that the facts here cannot. Unlike the plaintiff in *Troutman,* plaintiff in this case first learned about the TSA's historical use of waivers from Mr. Dhenin after he resigned from the TSA. Thus, plaintiff cannot establish an implied-in-fact contract that invalidates his appointive SF–50.

### D. The Oral Representations of TSA Personnel Are Not Contracts

 Moreover, like the plaintiff in *Troutman,* plaintiff here is precluded from relying upon the oral representations made to him by various TSA officials that his retirement status would not affect his employment with the TSA. "Federal officials who by act or word generate expectations in the persons they employ, and then disappoint them, do not ipso facto create a contract liability running from the Federal Government to the employee, as they might if the employer were not the government." *Shaw v. United States,* 226 Ct.Cl. 240, 640 F.2d 1254, 1260 (1981). Rather, as with implied-in-fact contracts, express contracts with the United States, including employment contracts, must be executed on behalf of the United States by a person having actual authority to do so. *Trauma Serv. Group,* 104 F.3d at 1325–26; *City of El Centro,* 922 F.2d at 820; *Kania,* 650 F.2d at 268; *see also Night Vision Corp. v. United States,* 469 F.3d 1369 (Fed.Cir.2006) ("The elements of an implied-in-fact contract are the same as those of an oral express contract."). Plaintiff has not shown that any of the individuals who assured him that his retirement status would not affect his TSA employment had the actual authority to execute employment contracts on behalf of the United States or otherwise waive the requirements of 5 U.S.C. § 8344(a) or 5 U.S.C. § 8468(a). Accordingly, their oral representations do not constitute express or implied contracts and cannot, therefore, provide the basis for a breach of contract action.

7. The court in *Troutman* also held that "[t]he terms of the statute establishing the deduction for annuities when a retired Federal worker is reemployed, and the process to obtain waivers from that requirement, do not provide a cause of action for money damages." 51 Fed.Cl. at 532

(referring to 5 U.S.C. § 8344(a) and what is now 5 U.S.C. § 8344(i)(1)). Had plaintiff in this case alleged that 5 U.S.C. § 8344 or 5 U.S.C. § 8468 was money-mandating, the court would have similarly rejected his argument.

### E. Conclusion

In sum, both the relevant statutory language and the proffered documentary evidence demonstrate that plaintiff was appointed to his position at the TSA. To be sure, the court is sympathetic to plaintiff's circumstances. Plaintiff, a nonlawyer, exercised due diligence as best he could. He repeatedly sought confirmation that his status as a federal retiree would not affect the terms of his employment. Moreover, the TSA personnel tasked with providing him information concerning federal employment assured him that his employment would not be affected by his retirement status. With this understanding, and for the sole purpose of TSA employment, plaintiff resigned his position with the Army at Fort Hunter Liggett, California and relocated to Gunnison, Colorado. It was not until after he began his TSA employment that he learned that his TSA pay would be reduced by his retirement annuity.

It is readily apparent that plaintiff was ill-served by the TSA personnel, who should be well-versed in the relevant law and should have informed plaintiff of the consequences of reentering the federal workforce as an annuitant. Nevertheless, the court is constrained by both the facts and the law. The relevant provisions of the Aviation and Transportation Security Act and title 5 of the United States Code, as well as the numerous documents describing plaintiff's employment as an appointment, dictate the conclusion that plaintiff was appointed; there was no separate contract of employment. Moreover, the law is well-settled that for plaintiff to receive his pay without an accompanying offset of his federal retirement annuity, the TSA was required to obtain a waiver. Unfortunately for plaintiff, the TSA did not do so. To mirror the statement of the court in

*Calvin,* the "TSA apparently made the screeners promises that it could not keep, but this court is without jurisdiction to compensate plaintiffs.... The plaintiffs should not have been treated so cavalierly, but as the court observed in *Shaw,* the plaintiffs' claims against the government are moral, not legal." 63 Fed.Cl. at 474–75.

## IV. APPLICATION TO PROCEED *IN FORMA PAUPERIS*

 Plaintiff filed, concurrent with his complaint, an application to proceed *in forma pauperis.* Pursuant to section 1915 of title 28 of the United States Code, courts of the United States are permitted to waive filing fees and security under certain circumstances.[8] *See* 28 U.S.C. § 1915(a)(1) (2006); *see also Hayes v. United States,* 71 Fed.Cl. 366, 366–67 (2006) (concluding that section 1915(a)(1) applies to both prisoners and non-prisoners alike). Plaintiffs wishing to proceed *in forma pauperis* must submit an affidavit that lists all of their assets, declares that they are unable to pay the fees or give the security, and states the nature of the action and plaintiffs' belief that they are entitled to redress. 28 U.S.C. § 1915(a)(1). Here, plaintiff submitted his application on a form supplied by the court for this purpose. He indicates that he has not been employed since June 2007, that he receives an unspecified amount of pension, annuity, or life insurance payments, that he has less than $1,300 in bank accounts, and that he owns a house that is currently appraised at $155,000. Although plaintiff does not disclose his current income from his pension, annuity, or life insurance on his application, as required, one exhibit to his complaint indicates that he received $8,650 from his retirement annuity in 2006 and another exhibit indicates that he receives a $435 monthly retirement annuity payment.[9] *See* Compl. Ex. 5 at 1; Compl.

---

**8.** While the Court of Federal Claims is not generally considered to be a "court of the United States" within the meaning of title 28, the court has jurisdiction to grant or deny applications to proceed *in forma pauperis. See* 28 U.S.C. § 2503(d) (2006) (deeming the Court of Federal Claims to be "a court of the United States" for the purposes of section 1915); *see also Matthews v. United States,* 72 Fed.Cl. 274, 277–78 (2006) (recognizing that Congress enacted the Court of Federal Claims Technical and Procedural Im-

provements Act of 1992, authorizing the court to, among other things, adjudicate applications to proceed *in forma pauperis* pursuant to section 1915).

**9.** Plaintiff also failed to provide the required description of the nature of his action. However, because his complaint is sufficiently clear on this topic, the court finds the omission to be harmless.

Ex. 7 at 2. The court is satisfied that plaintiff's apparently limited amount of retirement income, lack of employment, and small sum of liquid assets renders him unable to pay the filing fee.[10] *See also Hayes,* 71 Fed.Cl. at 369 ("The provision for waiving prepayment of filing fees provided by 28 U.S.C. § 1915 is not intended to take effect only after the applicant has exhausted all of his or her resources."). Accordingly, it grants plaintiff's application to proceed *in forma pauperis.*

## V. CONCLUSION

As set forth above, the court **GRANTS** plaintiff's application to proceed *in forma pauperis,* **GRANTS** defendant's motion to dismiss, and **DISMISSES** plaintiff's complaint for lack of jurisdiction. No costs. The clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

---

10. The court notes that defendant did not file an opposition to plaintiff's application to proceed *in* *forma pauperis.*